[No. B238820. Second Dist., Div. Seven. Oct. 9, 2012.]

In re ROBERTO C., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Appellant, v.
GUADALUPE E. et al., Defendants and Respondents.

## Counsel

John F. Krattli, Acting County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Appellant.

Lori A. Fields, under appointment by the Court of Appeal, for Defendants and Respondents.

## Opinion

**ZELON, J.**—The Los Angeles County Department of Children and Family Services appeals the dismissal of a Welfare and Institutions Code section 300 petition with respect to the child Roberto C. After a two-day evidentiary hearing, the juvenile court determined that the evidence was insufficient to sustain the petition. Finding no abuse of discretion, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 23, 2011, while in the care of his babysitter, then nine-month-old Roberto C. fell unconscious. The paramedics were called, and transported him to Harbor-UCLA Medical Center; a referral for neglect was made.

On September 30, 2011, while Roberto remained hospitalized, the Los Angeles County Department of Children and Family Services (DCFS) filed an application for an order of removal from the parents. The application cited medical conclusions that the child had suffered a brain bleed and that nonaccidental trauma was possible. The application also referred to mother's prior history with DCFS in 1998. Shaken baby syndrome was suspected, and the social worker concluded that "the act leading up to the injury most likely occurred while the child was in the care, custody and control of the parents or a person known by the parents."

DCFS filed a petition under Welfare and Institutions Code section 300 on October 5, 2011.[1] The petition alleged serious injury to Roberto due to acts by his parents, their failure to obtain necessary medical treatment, and their failure to protect him from further abuse.[2]

---

[1] All further statutory references, unless otherwise noted, are to the Welfare and Institutions Code.

[2] "On 09/23/11, the nine month old child Roberto [C.] was medically examined and found to be suffering a detrimental condition consisting of a posterior subdural hematoma, acute and chronic subdural hematomas and bilateral retinal hemorrhages. The child's [m]other, Guadalupe Esquivel, and [f]ather, Alberto Flores, gave no explanations for the manner in which the child sustained the child's injuries. The child's injuries are consistent with non accidental [*sic*] trauma. Such injuries would not ordinarily occur except as the result of deliberate, unreasonable and neglectful acts by the child's mother and father who had care, custody and control of the child. Such deliberate, unreasonable and neglectful acts on the part of the child's parents endanger the child's physical health, safety and well-being, create a detrimental home environment and place the child at risk of physical harm, damage and danger.

"On 09/23/11, the nine month old child Roberto [C.] was medically examined and found to be suffering a detrimental condition consisting of a posterior subdural hematoma, acute and chronic subdural hematomas and bilateral retinal hemorrhages. The child's [m]other, Guadalupe Esquivel and [f]ather, Alberto Flores failed to obtain timely necessary medical treatment for the child's injuries. The parents' medical neglect of the child endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger and medical neglect.

"On 09/23/11, the nine month old child Roberto [C.] was medically examined and found to be suffering a detrimental condition consisting of a posterior subdural hematoma, acute and chronic subdural hematomas and bilateral retinal hemorrhages. The child's [m]other, Guadalupe Esquivel and [f]ather Alberto Flores gave no explanations for the manner in which the child sustained the child's injuries. The child's injuries are consistent with non accidental [*sic*] trauma. Such injuries would not ordinarily occur except as the result of deliberate, unreasonable and neglectful acts by the child's [m]other and [f]ather who had care, custody and control of the child. Such deliberate, unreasonable and neglectful acts on the part of the child's parents endanger the child's physical health, safety and well-being, create a detrimental home environment and place the child at risk of physical harm, damage and danger.

"On 09/23/11, the nine month old child Roberto [C.] was medically examined and found to be suffering a detrimental condition consisting of a posterior subdural hematoma, acute and chronic subdural hematomas and bilateral retinal hemorrhages. The child's [m]other, Guadalupe Esquivel and [f]ather Alberto Flores gave no explanations for the manner in which the child sustained the child's injuries. The child's injuries are consistent with non accidental [*sic*] trauma. The child's [m]other and [f]ather knew, or reasonably should have known, that the child was being physically abused and failed to protect the child. Such physical abuse of the

The detention report cited interviews with both parents, with the babysitter, and with responding officers and members of the medical team. On October 5, 2011, the court ordered Roberto detained, and ordered reunification services and monitored visitation for the parents.

The jurisdiction/disposition report filed on November 3, 2011, indicated that Roberto had been transferred to Rancho Los Amigos National Rehabilitation Center for rehabilitation, and included detailed witness statements from: Roberto's mother (Mother); Roberto's father (Father); the father of Mother's other children (involved in the 1998 proceedings) and those children; Roberto's treating physician; the medical social worker; the babysitter, Maria Navarro; Navarro's adult daughter; and the coworker who had recommended Navarro to Mother. The report indicated that further investigation was needed to determine who had been involved in the acts leading to Roberto's injuries, but raised questions as to the credibility of parents based on their statements and Mother's prior history with DCFS, erroneously identified in the report as having occurred in 2008 rather than in 1998. On November 7, 2011, the juvenile court set the matter for adjudication on January 25, 2012, as a contested hearing, and ordered the exchange of witness and document lists and a pretrial conference.

The juvenile court held the adjudication hearing on January 25–26, 2012. The court admitted exhibits, and heard the testimony of four witnesses.

*Maria Elena Natividad (Maria Navarro)*

Navarro testified that she had cared for Roberto for three weeks prior to his hospitalization, from 6:30 a.m. to 4:00 p.m., Monday through Friday. Other than an incident of vomiting, for which Mother had sought medical attention, he was never sick and was not a difficult child. She noticed a bruise only once, when he hit his head on his walker while in her care; the mark was small. He was not hurt at any other time while in her care.

On Friday, September 23, Roberto was not sick when he was dropped off, and she noticed no bruises on his face. In the afternoon, she took him out to pick up other children at school; she initially had him in a stroller, but was carrying him in her arms when some dogs jumped up behind a fence. Roberto became upset, but then calmed down; as she arrived home, he fell over in her arms. She could not awaken him, called for help, and received assistance

---

child and the parents' failure to protect the child endangers the child's physical health, safety and well-being, creates a detrimental home environment and places the child at risk of physical harm, damage and danger."

from a neighbor until the police arrived.[3] Roberto was taken to the hospital, but she did not go because she had other children in her care. She denied shaking or hurting Roberto at any time while he was in her care.

### Dr. Sara Stewart

Dr. Stewart is the medical director of the Child Crisis Center and associate professor of pediatrics at Harbor-UCLA Medical Center, and serves as a member of the SCAN (Suspected Child Abuse and Neglect) Team. She has testified as an expert in dependency court, and was offered as an expert in this case. After objection by counsel for the parents that her expertise needed to be determined on an issue-by-issue basis, the parties examined her with respect to her qualifications. She testified that she had not completed residencies in ophthalmology, radiology, or neurology, but that her subspecialty of child abuse pediatrics encompasses the field of head trauma and other pediatric injuries. She had received training in, diagnosed, and testified as an expert with respect to, child head trauma. At the conclusion of this testimony, the court ruled that further objections by counsel should be on a question-by-question basis.

Dr. Stewart first saw Roberto on September 26, and was asked to consult based on a concern that inflicted trauma could be involved in his injuries. She reviewed his records, and evaluated him along with other doctors. She found bruising on his ear, retinal hemorrhages, and subdural fluid and hemorrhage. She found the bruising of the ear unusual; she found no other bruises. As to the subdural blood, the injury could have occurred three to seven days prior to his admission; she could not date the other injuries.

Dr. Stewart was asked whether the injuries were accidental or nonaccidental. The parents' counsel objected, and conducted further voir dire concerning her background, experience, and publications; the court heard argument from counsel. Counsel for DCFS conceded they did not establish Dr. Stewart as an expert, and the court agreed, finding she was not an expert as to shaken baby syndrome. Counsel for Roberto conducted further voir dire examination, after which the court found that Dr. Stewart was an expert in child abuse, but not shaken baby syndrome, and sustained the objection as to the single question whether the injuries were accidental or nonaccidental.

Dr. Stewart's direct testimony continued with respect to her experience observing children with both accidental and nonaccidental injuries, and her

---

[3] On cross-examination, other details were developed that were not disclosed in the direct testimony, including the presence of another infant in her care, and inconsistent descriptions of what happened when Roberto lost consciousness. She also testified that she had placed him on a sofa to sleep, and left him alone while she used the bathroom.

training in assessing such injuries. She testified that following her evaluation of Roberto she agreed with the other doctors that his injuries were due to inflicted trauma. She explained that the babysitter's explanations for the injuries did not in fact explain the injuries. She also described her evaluation of the biomechanics of such injuries, and concluded that Roberto could not have sustained his injuries through a simple fall. She believed that angular acceleration—shaking—was probably a component of at least some of the injuries.

On cross-examination, Dr. Stewart testified that there were no fractures or bruising observed on Roberto. She was questioned concerning hemorrhage in nonabuse situations, and the opinion of another consulting physician that Roberto suffered from benign external hydrocephalus, a condition that can put children at risk for retinal hemorrhages. Based on the information that she had at that time, she expressed the opinion that Roberto's injuries were due to inflicted trauma. She further testified as to mechanisms for Roberto's injuries. She did not know who might have caused those injuries, and stated that she did not have all of the information as to what had actually happened to Roberto during the 72 hours before he came to the hospital.

*Brenda Lima*

Ms. Lima, a DCFS employee, testified that Roberto was currently placed with his aunt, after rehabilitation treatment at Rancho Los Amigos hospital. He continued to suffer some visual and hearing impairment. She had interviewed both the babysitter and the parents; the babysitter had not indicated that Roberto had fallen from or while in his walker; the parents did not indicate that Roberto had fallen or been injured while in their care.

On cross-examination, she recalled that the babysitter, Ms. Navarro, had told her that Roberto hit himself on the walker or on the toys. She testified that information provided by Ms. Navarro's testimony in court had not been revealed to her by Ms. Navarro in her previous interviews. She was also examined concerning her conclusion that Mother had made inconsistent statements with respect to the fall in the walker, and testified that Mother's only information was what Mother had been told by Ms. Navarro. She also testified that the only other inconsistent statement Mother had made was with respect to the bruise that Mother had noted but which had not been seen by medical personnel. The parents' statements were consistent with each other. She was concerned that the parents had not asked the babysitter about the bruises in a timely manner, having waited in one instance until the babysitter called on the evening of the day the bruise had occurred and in the other instance planning to wait until pickup, rather than asking at the time of the morning dropoff. Because of Roberto's hospitalization, the parents never made that inquiry.

At the beginning of the proceedings on January 26, prior to the resumption of Ms. Lima's testimony, counsel for DCFS requested a stay of proceedings and an expedited transcript for the purpose of a writ; counsel failed to state any grounds for the request. The juvenile court denied the request.

After cross-examination of Ms. Lima was concluded, the court inquired about her statements that Mother's prior case had been in 2008, rather than in 1998, and Ms. Lima testified first that 2008 was the correct date, but then stated that she did not remember the year.

### Dr. Jason Peragallo

Dr. Peragallo is a pediatric ophthalmology fellow, who has seen four to five children under the age of one with retinal hemorrhages. He did not know whether any of those hemorrhages had been caused by nonaccidental trauma. The court denied DCFS's request to have him testify as an expert witness,[4] and he testified as Roberto's treating physician.

He examined Roberto on September 26, 2011, and determined that he had bilateral retinal hemorrhages. He had been told, prior to his examination, that this was a possible case of nonaccidental trauma, and testified that bilateral hemorrhages are consistent with a history of nonaccidental trauma. He had been given no explanations as to what might have caused Roberto's injuries. He could not make a determination as to whether nonaccidental trauma had occurred, but only whether there were hemorrhages and whether they were consistent with nonaccidental trauma.

At the conclusion of Dr. Peragallo's testimony, DCFS rested. Counsel for the parents, joined by Roberto's counsel, made a motion to dismiss pursuant to section 350, subdivision (c). Counsel asserted that DCFS had not met its burden of proof, in that there was insufficient evidence to find that the injury was not accidentally inflicted, that there was insufficient evidence of permanent disability to meet the requirements of section 300, subdivision (e), and that there was no evidence that the parents had either caused the injury or should have known that the babysitter was abusing Roberto. After hearing argument by all counsel, the juvenile court granted the motion and dismissed the petition.

DCFS again requested a stay and an expedited transcript, which the court denied. DCFS timely appealed, and petitioned this court for a writ of supersedeas. On March 5, 2012, this court ordered Roberto placed home with his parents under the supervision of DCFS, subject to any further orders of the juvenile court necessary to protect Roberto or to provide appropriate services.

---

[4] DCFS does not challenge this ruling on appeal.

## DISCUSSION

I. *The Juvenile Court Did Not Abuse Its Discretion with Respect to Dr. Stewart's Testimony*

### A. *The Standard of Review of Evidentiary Determinations*

We review the evidentiary rulings of the juvenile court for abuse of discretion, and will not disturb those rulings in the absence of a showing of a manifest abuse of that discretion. (See, e.g., *People v. Bolin* (1998) 18 Cal.4th 297, 321–322 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

 With respect to a witness proffered as an expert, the issue of qualifications is left to the exercise of discretion by the trial court. If the witness is found to have disclosed "sufficient knowledge of the subject to entitle his opinion to go before the jury," the court abuses its discretion by excluding the expert. (*Brown v. Colm* (1974) 11 Cal.3d 639, 646–647 [114 Cal.Rptr. 128, 522 P.2d 688] (*Colm*) [exclusion of witness on standard of care erroneous when based on lack of personal experience at the time period in question].) "Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility. [Citation.]" (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38 [210 Cal.Rptr. 762, 694 P.2d 1134] (*Mann*).)

### B. *The Court's Ruling Was Narrow*

DCFS asserts that the juvenile court erred by excluding Dr. Stewart as an expert on shaken baby syndrome, while permitting her to testify as an expert in child abuse. Dr. Stewart testified at length in this case; the transcript of her testimony spans 60 pages. While arguing that the juvenile court prevented her from explaining in detail her opinion that the injuries were caused by nonaccidental trauma, appellant cites only two pages in the transcript, which together contain only three questions concerning causation as to which the court sustained objections. When the entirety of Dr. Stewart's testimony is examined, however, the record demonstrates that she was permitted to express a broad range of opinions, including her opinions on causation in this case, and that her ability to place her opinions before the juvenile court as the trier of fact was not limited in any meaningful way.

#### 1. *The Challenged Rulings*

The first of the questions at issue was: "The question I had asked, which she never completed, was if you had formed an opinion as to whether the injuries were accidental versus nonaccidental?"

Prior to this question being asked, the court had specifically ruled that Dr. Stewart was entitled to testify, based on her experience as a doctor, to her opinion as to what had happened to Roberto. DCFS concedes that Dr. Stewart was allowed to testify that she agreed with the other doctors that the trauma was nonaccidental. She testified as follows: "Q. And after you examined the patient and reviewed the medical records, did you share the concerns of those doctors that this was nonaccidental trauma? A. I was in agreement with the other doctors that his injuries were due to inflicted trauma."

As her testimony continued, Dr. Stewart was permitted to give a lengthy explanation of the evaluation of the biomechanics of injuries in determining whether there was child abuse, including the concept of angular acceleration, or shaking. She testified that she had taken care of children with injuries similar to Roberto's, and then gave the opinion that Roberto could not have obtained his injuries through a simple fall, but that angular acceleration was "probably a component for at least some of his injury."

The two other rulings that DCFS challenges were sustained objections to the following questions: "Could the act of a child banging their head on a plastic toy cause the types of injuries that you observed in Roberto?" After the objection was sustained, Dr. Stewart was asked:

"Q. By Ms. Skolnick: In your experience have you seen subdural hematomas and retinal hemorrhages in a child where the explanation for the injury was that the child hit their head on a plastic toy?

"A. It—I guess my first question would be the context of the fall, like, from a standing position to the ground, no, I don't recall. I have not seen that. I don't recall that scenario for any child, hitting your head on a plastic toy and having retinal hemorrhages and subdural hemorrhages, no. But again, there can be case specific subtleties as to how I might answer that question."

The final objection was to the question: "Could the type of injuries that Roberto suffered be caused by having been shaken?" She then testified as follows: "Q. By Ms. Skolnick: Have you seen the type of injuries that Roberto has in other children where it was determined that the child was a victim of being shook.

"A. Yes, I have. The thing about this, if I may—"

On cross-examination, Dr. Stewart testified again that it was her opinion that Roberto's injuries were due to inflicted trauma. And, on redirect, she was

asked, and permitted to answer, questions as to whether the two specific accidental mechanisms at issue in the case could have caused the injuries observed.[5]

### 2. *The Trier of Fact Heard Dr. Stewart's Opinions*

As set forth above, a review of the actual record in this case demonstrates that the juvenile court, the trier of fact in this matter, heard all of Dr. Stewart's testimony. She testified as to her opinions on causation and on the mechanisms of injury, including whether she believed Roberto was injured by shaking. The disputes concerning the nature of her specific experience thus became an issue not of admissibility, but of weight. Here, the trial court, following the guidance of *Colm* and *Mann*, did not abuse its discretion, but as the decision maker, reserved to itself the ultimate determination of the weight to be afforded the testimony.

### II. *The Dependency Court Did Not Abuse Its Discretion Under Section 350, Subdivision (c)*

#### A. *The Statute and Rule of Court Impose a Duty to Weigh the Evidence*

Section 350, subdivision (c) provides that: "At any hearing in which the probation department bears the burden of proof, after the presentation of evidence on behalf of the probation department and the minor has been closed, the court, on motion of the minor, parent, or guardian, or on its own motion, shall order whatever action the law requires of it if the court, upon weighing all of the evidence then before it, finds that the burden of proof has not been met."[6]

Asserting that it had met the burden of proof, DCFS argues that the juvenile court improperly weighed the evidence, and made credibility judgments concerning the witnesses, in considering the section 350, subdivision (c)

---

[5] "Q. If a caregiver was carrying the child and something startled the child and the caregiver—the caregiver jumped back while holding the child, do you think that that could have been the cause of Roberto's injuries?

"A. I don't think so. I don't think the typical forces that would be involved in that sort of a move would cause the extent of the injuries, no.

"Q. If a child was sitting in a walker and fell forward in the walker and hit his head on the front of the walker or the table part of the walker, do you think that could have caused the type of injuries that were observed in Roberto?

"A. No, not if it is just the child still in the walker, but falling forward within the walker, I don't believe so."

[6] California Rules of Court, rule 5.534(d) also requires the court to consider all of the evidence before it on a section 350, subdivision (c) motion in determining whether the burden of proof has been met.

motion. In reliance on *In re Eric H.* (1997) 54 Cal.App.4th 955, 968–969 [63 Cal.Rptr.2d 230] (*Eric H.*), it submits that the court was obliged to treat the motion as a civil nonsuit motion is treated, and hence disregard conflicting evidence and any credibility issues. In the department's view, the court was required to accept all evidence, and any inferences that could be drawn from the evidence, produced by the department.

In *Eric H.*, the agency and the child moved to dismiss the section 300 petition at the jurisdictional hearing under section 350, subdivision (c). The mother sought to introduce additional evidence in support of the petition before the juvenile court ruled; the court did not permit her to do so and dismissed the petition. The question on appeal was whether a parent has a right to present evidence before the motion is decided, and the court found that the plain language of the statute did not permit a parent to do so. (*Eric H., supra*, 54 Cal.App.4th at p. 965.)

The mother in *Eric. H.* argued that the purpose of the statute was to permit the minor or parents to bring an action to a prompt conclusion where the agency failed to meet the burden of proof, and that allowing her to present evidence was consistent with that purpose. The court stated, in the language relied on in part by DCFS here: "Section 350(c), the equivalent of a motion for nonsuit, allows a parent to test the sufficiency of the Agency's evidence before presenting his or her case. [Citation.] However, it also promotes judicial efficiency. . . . Subdivision (c) of that same section permits the court to dismiss the dependency petition when, upon weighing the evidence on behalf of the agency and the minor then before it, it finds that the burden of proof has not been met." (*Eric H., supra*, 54 Cal.App.4th at pp. 968–969.)

█ This case squarely presents the question not before the court in *Eric H.*: What are the standards governing the juvenile court's consideration of a section 350, subdivision (c) motion? The *Eric H.* court did not discuss or consider, nor was it relevant to the issue before it, what standard should be applied in weighing the evidence. *Eric H.* is not, as a result, authority that the juvenile court may not weigh the evidence and consider the credibility of the witnesses. (See *People v. Banks* (1993) 6 Cal.4th 926, 945 [25 Cal.Rptr.2d 524, 863 P.2d 769] [well settled that an opinion is not authority for an issue not before the court].)

█ The language of the statute at issue, quoted above, is inconsistent with the standards developed for nonsuit under Code of Civil Procedure section 581, subdivision (c). That statute pertains to the determination of a motion where the court is not the ultimate trier of fact. It is silent as to the means which the court, in a jury trial, is to use in determining whether the case may proceed, and has been interpreted, as DCFS suggests, to preclude

the trial court from inserting itself in the jury's place by weighing the evidence before it or considering the credibility of the witnesses. (See, e.g., *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838 [206 Cal.Rptr. 136, 686 P.2d 656] [" 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded.' "] This directly contradicts the language of section 350, subdivision (c) requiring the court both to consider all of the evidence then before it—not only the evidence most favorable to the agency—and to weigh that evidence. **(4)** In interpreting a statute, we are charged to look first to its plain language, to give the words their usual and ordinary meaning and, in the absence of ambiguity, to presume that the Legislature meant what it said. (*Eric H., supra,* 54 Cal.App.4th at p. 965.) "[O]ur office is simply to ascertain and declare what the statute contains, not to change its scope by reading into it language it does not contain or by reading out of it language it does." (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253 [85 Cal.Rptr.3d 466, 195 P.3d 1049].) We decline to read the Legislature's instruction to the juvenile court out of section 350, subdivision (c).

Moreover, the statutory language in section 350, subdivision (c) is more like that used in a more analogous civil procedure,[7] a motion for judgment in a court trial under Code of Civil Procedure section 631.8. There, as in section 350, subdivision (c), the court is the ultimate trier of fact, and, as the trier of fact, the court is instructed to weigh the evidence. (*Roth v. Parker* (1997) 57 Cal.App.4th 542, 549–550 [67 Cal.Rptr.2d 250] [Code Civ. Proc., § 631.8, in a nonjury case, serves same function as Code Civ. Proc,. § 581c in a jury trial, but requires trial court to weigh evidence to determine if plaintiff has sustained burden of proof].)

Based on the plain language of the statute, and its purpose of allowing a challenge to the showing prior to extending the proceedings, we conclude that the juvenile court did not err in weighing the evidence and considering the credibility of the witnesses it observed in its consideration of the section 350, subdivision (c) motion in this case.

B. *The Juvenile Court Did Not Abuse Its Discretion in Determining That DCFS Failed to Meet Its Burden of Proof*

DCFS asserts that it met the burden of proof with respect to section 300, subdivisions (a), (b), and (e) by presenting evidence that the injuries were

---

[7] Dependency matters, of course, are special proceedings generally regulated not by the rules of civil procedure but by their own statutes and rules. (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 711 [17 Cal.Rptr.2d 759].) However, where appropriate, we may consider analogies to the requirements of civil procedure.

caused by nonaccidental trauma, and that the injuries were likely to leave Roberto permanently disabled and possibly blind. DCFS does not assert that it presented evidence establishing who inflicted the injuries on Roberto, arguing that it was not required to do so under the authority of *In re E. H.* (2003) 108 Cal.App.4th 659 [133 Cal.Rptr.2d 740] (*E. H.*). It further asserts that the testimony demonstrated the "willful or negligent failure [of the parents] to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left" (§ 300, subd. (b)), and that the severe abuse was by someone known by the parents and that the parents "knew or reasonably should have known that the person was physically abusing the child." (§ 300, subd. (e).)

The juvenile court, in ruling on the motion, pointed to the fact that there was no evidence linking the parents to the infliction of the injuries; DCFS points to none, and the record contains none. The court also expressed concern about the credibility of the DCFS investigator, and the babysitter, concerning the injuries and the knowledge they attributed to the parents.

We review the decision of the juvenile court under the substantial evidence test, considering whether there is substantial evidence, whether contradicted or not, that supports the position of the trier of fact. We resolve conflicts in favor of the decision, and do not reweigh the evidence or determine the credibility of the witnesses. And "[a]bsent indisputable evidence of abuse— evidence no reasonable trier of fact could have rejected—we must therefore affirm the juvenile court's determination." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200 [23 Cal.Rptr.2d 482] [affirming dismissal of dependency petition at jurisdiction hearing]; see *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 [32 Cal.Rptr.3d 526] [dependency court's determination not overturned " 'unless it exceeds the bounds of reason.' "])

In this tragic case, it is clear that someone caused serious injury to Roberto. However, the evidence is also clear that Roberto, even when taken to the hospital, had no broken bones and no bruises. The only visible evidence of injury was described by all parties as minor bruising, if visible at all; even on the morning of his hospitalization he was described as a normal healthy child. There is no evidence that provides any basis to attribute knowledge to these parents that Roberto was being abused, much less severely abused within the meaning of the statute.

*E. H.* does not fill in the gaps in this record. In that case, the child was hospitalized with multiple broken bones, at various stages of healing. The

child's mother was living with her mother and siblings, one of whom was disabled. No one outside of the household took care of the child; within the household, "whoever is around takes care of the children." (*E. H., supra*, 108 Cal.App.4th at p. 662.) The child was described as crying all of the time, and had a visible injury to her leg before the broken bones were discovered. The juvenile court found that the evidence did not establish who had injured the child, although the record had established that the injuries were apparent and had been intentionally inflicted by someone in the household. (*Id.* at p. 667.) The court declined to exercise jurisdiction.

On appeal, this court found that the parents reasonably should have known that the child was being abused, as she cried whenever she was handled and had been given a diagnosis of colic which had been ignored by the parents. We also found the parents reasonably should have known the identity of the perpetrator, as only family members had been involved in the child's care, and concluded that lack of actual knowledge of the mechanism of the injuries, and the inability to identify a perpetrator beyond a cast of possibilities, did not rule out jurisdiction. (*E. H., supra*, 108 Cal.App.4th at pp. 669–670.)

The recognition that circumstantial evidence may support a finding despite the inability to identify the perpetrator does not, however, lead to the conclusion that a court may presume both that the parents knew, or should have known that the child was injured, and knew, or should have known who the perpetrator was, to support a finding against the parents.

The petition in this case alleged facts under section 300, subdivisions (a), (b), and (e). Subdivision (a) requires that the harm be inflicted by the child's parent or guardian. Subdivision (b) requires the parent either to fail to adequately supervise or protect the child or to willfully or negligently fail to protect the child from the conduct of the child's custodian. Subdivision (e) requires severe physical abuse, as defined by the statute, either by a parent, or by "any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." In each of these provisions, therefore, in the absence of evidence of actual abuse or neglect by the parent, there must be a showing that the parent knew or had reason to know that another person to whom the child was exposed was engaging in conduct resulting in abuse or injury. Simply knowing that a particular person had contact with the child without also knowing, or having reason to know, of the abuse, does not satisfy the statutory mandate.

 In *E. H.*, while the extent of the injuries was unclear, the record demonstrated that the child's condition was such that the parents should have known the child had been injured; it was only the perpetrator who was unknown. In contrast, the record here, at all times prior to Roberto's sudden collapse and hospitalization, describes the child as happy and healthy, with an incident of vomiting for which the parents sought prompt medical attention, and one, or possibly two, minor bruises. Only the DCFS investigator, whose credibility the court seriously questioned, asserted the parents had been insufficiently vigilant with respect to Roberto's physical condition. The facts contained in this record do not create a level of certainty concerning the parents' knowledge sufficient to find an abuse of discretion by the juvenile court. Indeed, to find that DCFS had met its burden in this case, we would have to presume both that the parents knew, or should have known, that Roberto was injured, and that they knew, or should have known, that Ms. Navarro was injuring him. The juvenile court declined to make those two assumptions; it did not abuse its discretion in doing so. (See *Savannah M., supra,* 131 Cal.App.4th at p. 1393 [inferences must rest on the evidence, and cannot support a finding if they " 'are the result of mere speculation or conjecture.' " (italics omitted)].)

In *In re A.S.* (2011) 202 Cal.App.4th 237 [134 Cal.Rptr.3d 664] (*A.S.*), the juvenile court sustained a jurisdictional finding after a full hearing where there was also no explanation provided as to the cause of the injury; the parents provided no medical evidence to dispute the opinion that the injury was nonaccidental. For purposes of the hearing, the court accepted that an accident was the same as neglect, and sustained the petition under section 300, subdivision (b). (202 Cal.App.4th at p. 242.) On appeal, the court found substantial evidence to support the trial court's finding, accepting " 'the evidence most favorable to the order as true and [discarding] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.' " (*Id.* at p. 244.) Because the evidence supported the conclusion by the juvenile court that the parents could not be ruled out as perpetrators, a reasonable inference could be drawn to support jurisdiction under subdivision (b), and the appellate court declined to "tamper" with the ruling of the juvenile court. (202 Cal.App.4th at p. 246.)[8] Applying the same standard of deference here, the conclusion of the juvenile court that there was no evidence that the parents knew or should have known of the abuse is supported by substantial evidence. We find no abuse of discretion.

---

[8] DCFS also argues that the juvenile court here improperly substituted its opinion as to the mechanism of the injury for the medical evidence, citing *A.S.* In that case, the court found the juvenile court's reasoning in that regard to have been faulty, but declined to overturn the order because it was correct on another ground. The same result would apply here; even if we were to find that the juvenile court's reasoning was incorrect in some regard, it is the action, not the reasoning, that we review. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876 [7 Cal.Rptr.2d 277].)

## DISPOSITION

The order of the juvenile court is affirmed. The order of this court on the petition for writ of supersedeas is vacated.

Woods, Acting P. J., and Jackson, J., concurred.