Filed 12/21/15  In re M.V. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.V., a Person Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br> MARIA V.,<br><br>    Defendant and Appellant;<br><br>C.V.,<br><br>    Defendant and Respondent. | B257572<br>(Los Angeles County<br>Super. Ct. No. DK01247) |

APPEAL from an order of the Superior Court of Los Angeles County, Teresa Sullivan, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

The Reape – Rickett Law Firm and Donald S. Sherwyn, for Defendant and Respondent.

Children's Law Center of Los Angeles and Jennifer McCartney for M.V.

Appellant Maria V. (Mother) appeals the juvenile court's order dismissing the dependency petition filed by the Department of Children and Family Services (DCFS) accusing respondent C.V. (Father) of viewing child pornography and asserting that their adopted daughter, M.V., was at risk of sexual abuse by Father. DCFS did not appeal the dismissal.[1]  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Detention Report*

The family came to the attention of DCFS in August 2013.  Mother reported that on August 6, while she was bathing M.V., the girl, who had just turned three, touched and manipulated her genital area, saying that Father had told the child to open her vagina so he could "see if [her] bones [were] small."  According to Mother, M.V. also said she wanted to see "Daddy's jelly fish," seemingly indicating his genitalia.[2]  Mother confronted Father, who denied any wrongdoing.  Mother took M.V. for a forensic medical examination, which revealed no signs of abuse.  She nonetheless reported her concerns to DCFS a few days after the incident.[3]  During her interview with the caseworker, Mother said she and Father

---

[1]    M.V.'s counsel and Father each filed respondent's briefs supporting the juvenile court's decision.

[2]    Prior to contacting DCFS, Mother reported the incident to sheriff's deputies.  In addition to the above, Mother also told deputies that M.V. referred to her vagina as her "'bum'" or "'bam.'"  During the deputy's interview of M.V., she said nothing about Father touching her inappropriately and did not repeat any of the things allegedly said to Mother.  The deputy concluded the child "had difficulty understanding the difference between 'truth and lies.'"  Father was interviewed and denied viewing child pornography.  The criminal investigation was closed due to insufficient evidence.

[3]    Mother moved into a relative's home with M.V. before contacting DCFS.  She and M.V. returned home after Mother obtained a restraining order barring Father from the family residence.  The court subsequently detained M.V. from Father.  From the time the
*(Fn. continued on next page.)*

had watched pornography together when they were newlyweds, but she had contemplated divorcing Father in 2012 because he had been viewing pornography involving "teens." They had participated in marriage counseling and gone to a couple's retreat to address problems within their marriage, including their sexual relationship and Mother's concern about Father's attraction to pornography.

Interviewed by the caseworker, Father denied any wrongdoing, and expressed doubt that M.V., at her age and maturity level, could have verbalized the accusations attributed to her. Father denied watching pornography involving teenagers, but admitted watching adult pornography, and said that he and Mother had viewed adult pornography together on some occasions outside M.V.'s presence.

A forensic evaluator who interviewed the child in conjunction with her medical examination reported: "Child unable to provide narrative practice due to maturation level. Child did report taking shower with Dad -- [n]o inappropriate touching was reported."[4]

The caseworker contacted the couple's marriage therapist, who said Mother and Father had attended several sessions with her to address Mother's concern about Father's attraction to adult pornography, but no one had ever suggested he had viewed pornography involving underage teenagers or children. During the sessions, Mother admitted watching pornography with Father. The therapist recalled that the couple was very naive about sexual matters and had gone to a retreat to address their problems with sexual intimacy.

---

allegations were made in August 2013 until the petition was dismissed on June 27, 2014, Father had only monitored access to M.V.

[4] Both parents later confirmed that Father and M.V. had showered together when the child was younger. This occurred on fewer than half a dozen occasions, all in Mother's presence.

B. *Team Decision Meeting*

At an August 29, 2013 team decision meeting (TDM), Father denied that he ever had examined or touched his daughter's vagina, or that he encouraged her to call genitalia "'jelly fish.'" He showed the caseworker pictures from a recent trip to the aquarium where the family had viewed a jellyfish exhibit. He also provided a children's book about sex and adoption that Mother had brought home from the library around the time M.V. allegedly made the jellyfish statement. A drawing in the book depicting sperm swimming toward an ovum resembled a jellyfish.

At the meeting, Mother repeated her previous allegations. Mother also provided a list of Web sites linked to pornographic videos she had allegedly obtained from taking a photograph of Father's computer screen in September 2012.[5] From the titles it appeared that the plots of approximately one-third of the videos involved various types of incest or sexual conduct by teenagers. One of the titles indicated a plot involving father-daughter incest. Mother said she had opened unspecified links and observed men having sex with females who appeared to her to be young adolescents.

The caseworker confronted Father with the list provided by Mother, but did not ask which, if any, of the videos Father had viewed. She instead asked whether Father had watched pornography involving teenagers or pre-teens. Father unequivocally denied having seen any videos involving underage youth. He explained that the descriptions in the titles were not accurate, as the actors in such videos were adults pretending to be younger. The caseworker asked if pulling up this type of Web site was an indication the person performing the search was

---

[5]     The caseworker provided this list to the criminal investigators. There is no indication in the record Father was ever charged with possessing or viewing child pornography.

looking for underage or incestual pornography. Father stated that search engines pull up a wide variety of pornography. After learning that Father had occasionally showered with M.V., the caseworker told him he should undergo therapy to address "boundary violations," including "watching what is advertised to be underage and incestual porn[ography] and showering with his daughter." Father said he was willing to attend therapy to address these concerns.

C. *Petition*

In September 2013, DCFS filed a petition alleging that Mother and Father "created a detrimental and endangering home environment for [M.V.]" based on her "shower[ing] [with Father] on numerous occasions" and on Father's "history of viewing child pornography." The petition further alleged that Mother failed to protect M.V., in that she allowed Father to shower with the girl and to reside in the home and have unfettered access to the girl. According to the petition, M.V. was at substantial risk for physical harm and sexual abuse within the meaning of Welfare and Institutions Code section 300, subdivisions (b) and (d).[6]

D. *Jurisdiction/Disposition Report and Supplemental Reports*

Prior to the jurisdictional hearing, the caseworker interviewed M.V. in Mother's presence. The caseworker reported that Mother was "very leading," and that on several occasions the caseworker had to counsel Mother against pushing M.V. too hard. For example, during the interview, M.V. said no one had touched her in her vaginal area except Mother when she changed her diapers. Mother told her to be honest and repeat what she had said earlier or she would not get to go to the library. When M.V. continued to say "nobody," Mother stated: "'I see you

---

[6]     Undesignated statutory references are to the Welfare and Institutions Code.

5

don't want to be honest . . . so no library.'"[7] The child eventually told the caseworker that Father massaged her, but when asked where, said "shoulders, back and neck." The child also displayed odd behaviors in front of the caseworker, including revolving on her bottom while holding her legs apart in the air, and straddling a chair while bouncing up and down, saying Father told her to do this "when your bum hurts."[8] The caseworker expressed concern that these behaviors were indications that M.V. had been sexually abused or was being groomed for abuse. However, M.V.'s therapist, after seeing the child for several months, reported that the child showed no signs of abuse or trauma and talked about missing Father.

Father was reinterviewed about the list of pornographic Web sites. He said he had watched videos from the "X Video[]" site, but did not remember precisely which ones.[9] He said that all the actors in the videos he watched were adults, and denied that the sites he visited specialized in underage or incest-related pornography. The caseworker again confronted him with the list of videos produced by Mother, but Father continued to maintain he had viewed only X Video content and that the actors in the videos he watched looked like adults. Father stated he believed Mother was making untrue reports about him because she had initiated divorce proceedings and wanted to gain sole custody of M.V.

The monitors for Father's visits indicated the visits went well. Father brought snacks and toys, and interacted appropriately with his daughter. M.V. was sad when the visits ended. During one visit, she attempted to put her hand on

---

[7]    On a later occasion, Mother put M.V. on the phone with the caseworker and could be heard in the background coaching M.V. to say she did not want to visit Father.

[8]    Father denied observing or commenting on such behavior.

[9]    About half the videos on the list appeared to be from X Video. The father/daughter incest video was not among them.

Father's crotch. Father stopped her. On another occasion, M.V. reported to Mother she sat in Father's lap. The monitor reported that M.V. was never permitted to sit in Father's lap and that when she tried, Father redirected her. M.V. also allegedly told Mother that Father touched her bottom during a monitored visit. The monitor denied this allegation and said that Father was appropriate in all his visits.

In April and May 2014, after the jurisdictional hearing began, Mother reported a number of additional incidents, including M.V. touching her vagina in a sexual way and saying "Daddy" had shown her how to do this during a monitored visit, and M.V. touching Mother's breast and crotch area and saying she wanted to kiss Mother on the lips and Father on his "baby butt." In May 2014, the caseworker expressed concern that Mother was leading M.V. to make statements accusatory of Father. M.V.'s therapist reported that Mother was causing M.V. stress and anxiety by repeatedly asking the girl about sexual abuse. On learning that the therapist had not heard any reports of sexual abuse from M.V., Mother pushed the therapist to question the girl more forcefully about it. An in-home family preservation counselor observed Mother questioning M.V. about sexual abuse during Father's monitored visits "until [M.V.] said what [Mother] wanted to hear," stating there had been "a steady progression of [Mother's] anxiety and inappropriate communication with the child."

E. *The Hearing*

The hearing on jurisdiction took place over several days between February and June 2014. Mother testified that she was M.V.'s primary caregiver and had almost never left the child alone with Father. She further testified that Father had never given M.V. a shower or bath by himself. In addition, Mother testified that

7

she had watched adult pornography with Father, and had never witnessed Father viewing child or incest-related pornography.

Father denied ever watching child pornography or incest-related pornography. Asked on cross-examination whether he had admitted viewing the videos on the list produced by Mother, Father said his comments at the TDM were in reference to the X Video site, which he visited to view pornographic videos online.

Father's expert, Stan Katz, Ph.D., testified that showering or bathing with a young child was not sexual abuse and had no correlation with sexual abuse. Dr. Katz further testified that viewing pornography, whether adult or child oriented, was not correlated with molesting children, and that many people view many types of pornography without acting out what they have seen. He further testified that some children act out sexually without having been abused.

To rebut Dr. Katz's testimony, DCFS presented a report by its own expert, Barry Hirsch, Ph.D. Dr. Hirsch stated that Dr. Katz's opinion was based on limited information and outdated methodologies. Dr. Hirsch believed that indirectly teaching a child that deviant sexual behavior was appropriate by viewing real or simulated portrayals of underage children having sexual relations with adults was itself a form of abuse. Dr. Hirsch also stated that in his viewing of videos on the X Video site, he found that some of the actors "look[ed] like early adolescents . . . ."

During closing argument, DCFS's counsel acknowledged it was impossible to prove that any of the actors were under 18 "just by viewing [the videos]." Mother's counsel argued the petition should be sustained regardless of whether the court found that the videos met the legal definition of child pornography.

Father's counsel contended that the petition should be dismissed. Counsel for M.V. agreed, contending the evidence presented was insufficient to sustain the petition or to support that M.V. was at a risk of sexual abuse by Father. She

8

pointed out that Mother always had been the primary caregiver, and that Father was almost never left alone with M.V.  She asserted there was insufficient evidence to connect Father with child pornography, or even the simulated child or teen sex purportedly portrayed in the videos on the list.  She observed that as the case progressed, the frequency of Mother's disclosures increased, and opined that the "progression of disclosure[]" was at least "partially fueled by [Mother's] anxiety and . . . conduct with [M.V.]."

The court found no detriment or risk of harm based on the allegation that Father and M.V. occasionally showered together.[10]  With respect to the allegation that Father created a risk of sexual abuse by viewing child pornography, the court found no evidence that Father had a history of viewing child pornography.  Specifically addressing the videos on the list produced by Mother, the court found no evidence that the videos were "viewed or analyzed" by anyone other than Dr. Hirsch in preparation for this report -- and he had failed to specify which ones he had viewed.  Although Dr. Hirsch indicated there were "pubescen[t]-appearing individuals" in some of the videos on the list and on the X Video site, there was "no evidence . . . that any of the content involved any pre-pubescen[t] individuals."  The court specifically found "no evidence" that any of the pornography Father admitted viewing was "in any way . . . child pornography," pointing out that it had not been presented with "any evidence that [Father] viewed the specific files that were indicated on the [list]," or that even if he had, "those files constituted child pornography as described in that aspect of the petition."

Discussing the expert evidence, the court stated that it had discounted Dr. Katz's testimony due to Dr. Hirsch's criticisms, but pointed out that Dr. Hirsch's report stated only that "[the] values [of watching deviant

---

[10]    On appeal, Mother does not seek to revive this allegation.

pornography] would be transmitted to his daughter," not that she was at risk of sexual molestation. Prior to issuing its ruling, the court observed that "[b]y the end of the last [DCFS report], the Department's own assessment is . . . that the child's therapy time is being spent trying to calm the mother down, and that the shift from the Department has been from protecting the child from the father to concerns about the mother's behavior and its effect on the child." Accordingly, the court dismissed the petition. Mother appealed. DCFS did not.

## DISCUSSION

A. *Mother's Standing to Appeal*

The issue whether a parent has standing to appeal a juvenile court order dismissing a section 300 petition has not been definitively resolved. (Compare *In re Lauren P.* (1996) 44 Cal.App.4th 763, 770 [mother had standing to appeal court's dismissal of petition] with *In re Carissa G.* (1999) 76 Cal.App.4th 731, 736 [mother lacked standing to appeal dismissal order] and *In re Tomi C.* (1990) 218 Cal.App.3d 694, 698 [father was not aggrieved by DCFS's decision to voluntarily dismiss petition].) For purposes of this appeal, we presume standing and resolve the case on the merits.

B. *The Court's Jurisdictional Finding*

Section 350, subdivision (c) provides: "At any hearing in which the [agency] bears the burden of proof, after the presentation of evidence on behalf of the [agency] and the minor has been closed, the court, on motion of the minor, parent, or guardian, or on its own motion, shall order whatever action the law requires of it if the court, upon weighing all of the evidence then before it, finds that the burden of proof has not been met. That action includes . . . the dismissal of the petition . . . ." A dismissal under section 350 resembles a grant of a motion under Code of Civil Procedure section 631.8, which authorizes a nonsuit in a

10

nonjury case, permitting the court, as the ultimate trier of fact, to weigh the evidence. (*In re Emily D.* (2015) 234 Cal.App.4th 438, 449; *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1479-1480; *In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1254.)

We review the decision of the juvenile court to dismiss a jurisdictional petition under the substantial evidence test, "considering whether there is substantial evidence, whether contradicted or not, that supports the position of the trier of fact." (*In re Roberto C.*, *supra*, 209 Cal.App.4th at p. 1254.) "'[A]bsent indisputable evidence [in support of the allegations of the petition] -- evidence no reasonable trier of fact could have rejected -- we must . . . affirm the juvenile court's determination.'" (*Ibid.*, quoting *In re Sheila B.* (1993) 19 Cal.App.4th 187, 200; see *Heap v. General Motors Corp.* (1977) 66 Cal.App.3d 824, 831-832, ["'To find *substantial* evidence in support of a finding of *no* evidence draws the reviewing court into a kind of juridical shell game. There is a more palatable approach. . . . Where, as here, the trial judge is directed by statute to weigh the evidence and make findings, . . . he may draw such inferences as seem reasonable to him. The following then becomes the appropriate rule on appeal: "'When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court . . . .'"'"].)

The court rejected no indisputable evidence here. The only evidence to support the inference that Father behaved inappropriately toward his daughter were the statements M.V. allegedly made to Mother after her bath on August 6, 2013, when M.V. was barely three years old. M.V. never repeated those or any similar allegations to anyone else. Two independent examiners found the child was unable to provide a reliable narrative due to her lack of maturity and her inability to distinguish truth from fantasy. The therapist who treated M.V. during the proceedings heard no reports of abuse and saw no evidence of abuse or trauma.

11

Moreover, Mother herself reported that Father was virtually never alone with the child in her short life, leading a reasonable trier of fact to question when any such incidents could have occurred.

Mother's brief details multiple incidents in 2013 and 2014 in which M.V. reportedly made statements possibly related to sexual matters or engaged in odd behavior that might be viewed as sexualized. It is clear from the record, however, that the majority of the alleged statements or incidents occurred after Father's presence in M.V.'s life was restricted to brief monitored visits. During this period, several independent observers stated that Mother was leading M.V. to make additional allegations by repeatedly questioning the child until she received the answer she wanted, indicating that the child was making statements about Father to please Mother. Accordingly, the court could reasonably conclude that M.V.'s actions and statements had nothing to do with Father.

Mother's brief focuses on the court's findings of "no evidence" to support that allegation that Father viewed child pornography or videos containing incest-related content, and its finding of "no evidence" that any of the videos on the list involved "pre-pubescen[t] individuals." Mother contends the court's statements were erroneous and require reversal of the dismissal order. She cites no authority for the proposition that when a court states there is "no evidence" but the record reflects some modicum of evidence, the court's ruling must be reversed. Moreover, our review of the record indicates the court's statements were accurate. Neither Mother nor DCFS presented evidence that any of the videos on the list produced by Mother contained underage actors.[11] Mother expressed the opinion

---

[11]     The fact that these sites were readily accessible by Mother and Dr. Hirsch and that there was no follow-up by law enforcement officials when the caseworker provided the list militates against inferring the participants were underage.

that one or two appeared to be underage, and Dr. Hirsch described some of the actors as looking like early adolescents. But the court did not find there was no evidence the actors in the videos looked young, only that none looked "pre-pubescen[t]."

Mother contends that Father admitted viewing the videos on the list, including some purportedly portraying father/daughter incest or incest of other kinds, and others portraying young girls involved in sexual behavior. Mother bases this contention on the caseworker's questions and Father's answers during the TDM. From the report, it is clear the caseworker did not ask Father whether he viewed all of the videos on the list or any specific one. His statements to the effect that video titles did not necessarily reflect their content, and that the actors in the x-rated videos were adults acting as if they were younger, did not constitute an admission that he had viewed all the videos on the list, and the court was not required to conclude otherwise.[12]

Finally, Mother contends the court wrongly focused on whether the videos contained actual child pornography when, in her view, "[w]atching . . . materials with 'actors' depicting children engaging in sexual intercourse, creates a risk of harm sufficient for the juvenile court to sustain jurisdiction." First, we must emphasize that there was no evidence that any of the videos on the list portrayed children, as opposed to teenagers or actors who looked like teenagers. Second, as noted, there is no evidence that Father watched any videos involving actors portraying close relatives or children. Finally, even were the evidence otherwise, the court was not required to draw the conclusion Mother urges. As the court

---

[12]     *Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 83, cited by Mother in support of her contention that Father's responses should have been construed as adoptive admissions does not assist her. That case held that whether a party's statements or conduct constitute an adoptive admission is a question of fact for the trier of fact.

observed, Dr. Hirsch asserted only that a father who watched deviant pornography would likely transmit that value to his children, not that he was likely to molest them. On this record, the court was not required to find that M.V. was at risk of sexual abuse.

## DISPOSITION

The order dismissing the petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



MANELLA, J.


We concur:



EPSTEIN, P. J.



COLLINS, J.



14