Filed 6/11/14  Pedro B. v. Super. Ct. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PEDRO B., | No. B255018 |
| Petitioner, | (LASC Case No. CK93532) |
| v. | Hon. Connie Quinones, Judge) |
| SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES, | |
| Respondent; | |
| LOS ANGELES DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

Petition for Extraordinary Writ:  Denied.

Los Angeles Dependency Lawyers, Inc.; Law Office of Marlene Further, Melissa A. Chaitin, and Tiffany Rodriguez for Petitioner.

No appearance for Respondent.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel for Real Party In Interest.

# INTRODUCTION

The Los Angeles County Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code section 300[1] petition on behalf of 13-year-old J.B. and five-year-old B.B. based on allegations that Pedro B. (father), physically abused J.B., his stepson, and had a history of acts of domestic violence with the children's mother. The juvenile court sustained the petition and removed the children from parental custody. The mother passed away. By a petition for an extraordinary writ, father seeks to vacate the orders at a section 366.22 hearing not returning B.B. to his custody, setting a section 366.26 hearing, and terminating reunification services; and seeks to remand the case for instructions to allow for placement of B.B. in the care of father with continued family maintenance services. We deny the petition for an extraordinary writ.

# BACKGROUND[2]

In May, 2012, there were referrals to DCFS that B.B. and J.B. were at risk of abuse and neglect, including physical abuse. The children's mother was then hospitalized for cancer. J.B. reported that father physically assaulted the maternal grandmother who had arrived from Mexico to assist the family.

Children's Social Worker (CSW) Rivas arrived at the Los Angeles Police Department's (LAPD) Rampart Division during that period after she learned two LAPD officers had detained the children based on the physical abuse allegations against father. J.B. reportedly had injuries to his body from an incident a week earlier during which father struck him with his fists, feet, and a belt. J.B. informed the officers that a week

---

[1]    All further statutory references are to the Welfare and Institution Code unless otherwise indicated.

[2]    The facts are taken from the evidence before the juvenile court.

earlier, father had arrived home after midnight, awakened him, and hit him numerous times with an open hand. Father also previously had struck the child with a belt, causing marks and bruises on the child's forearms. The officers observed that J.B. had a visible injury on his right forearm. J.B. said this incident occurred in the presence of B.B. and the maternal grandmother, who also was hit by father.

J.B. informed the officers that father verbally abused him as well. J.B. said a social worker had come to the family home earlier, but father refused to allow her to enter. The following day, J.B. called his maternal uncle from school, asking his uncle to pick him up. J.B. stated he could not return home. J.B. reported that B.B. had been hit by father.

The maternal grandmother accompanied the children and the officers to the police station. She reported witnessing father assault J.B. The maternal grandmother recalled father pulling the child down by his hair, kicking him numerous times, slapping him, and hitting him with a belt. The maternal grandmother also heard father calling J.B. derogatory names and making a reference to his "filthy blood" because J.B. was not father's biological child.

Both J.B. and the maternal grandmother expressed concerns about their safety and reported being extremely fearful of father. The maternal grandmother told the officers that she visited mother at the City of Hope Medical Center where mother was being treated for cancer. After the hospital visit, father ousted maternal grandmother from the house, and the maternal grandmother had to wait on the corner until the maternal uncle could pick her up.

During a forensic medical examination, both children reported being afraid of father. The nurse practitioner reported that B.B. did not have any marks or bruises on her body but confirmed "past belt use by father . . . as to child [B.B.]" J.B. was observed to have two large bruises on his right arm.

When CSW Rivas contacted father, he expressed some belligerence. He also stated he started having problems once the maternal grandmother arrived from Mexico. Regarding J.B.'s marks and bruises, father said J.B. sustained the bruises as a result of

3

fights in school or they were self-inflicted. He stated J.B. bled easily and often "inflict[ed] his own bloody noses." Father then informed CSW Rivas that he was not going to speak to her any further "about that ungrateful kid," described the LAPD as "animals," and indicated he would be obtaining a lawyer.

CSW Rivas then visited mother at the City of Hope Medical Center. The hospital staff informed CSW Rivas that father had contacted mother at 2:00 a.m., telling her to leave the hospital against medical advice. The staff told CSW Rivas that mother's bone marrow transplant had not been successful and her white blood count was zero. They informed mother that if she were to leave the hospital, she would die.

The hospital staff also expressed concerns about J.B., as they too had seen marks and bruises on the child's body. When they attempted to speak to father about J.B.'s bruises, father became hostile. Father's behavior resulted in security having to intervene. The hospital staff stated father had not been back to the hospital since that incident.

Mother informed CSW Rivas that she was not aware father was physically abusing the children, but believed the maternal grandmother. She said she would be in the hospital for approximately four months and wanted her children placed with their maternal aunt. Mother's family was concerned that father would report them to Immigration and Naturalization Services and have them deported—as he had threatened to do. During the interview, mother attempted to speak with father by telephone about the situation. Father told her he was not going to speak to the CSW or participate in any services and advised mother to do the same.

CSW Rivas took the children into protective custody. DCFS filed a section 300 petition on behalf of the children, based on father's physical abuse of J.B. At the detention hearing, the juvenile court found a prima facie case for detaining the children from father and that they were minors described by section 300, subdivisions (a), (b), and (j). The children were placed in their mother's custody, who, due to her hospitalization, made arrangements for the children to reside with their maternal aunt. DCFS filed a first amended petition, further alleging that mother and father had a history of domestic violence and that father had physically assaulted mother in the children's presence.

4

J.B. told the Dependency Investigator that he had lived with father since he was seven years old. He recalled father started hitting him approximately three to five months after they started living together. He said he stopped hitting him in public, so "now he hits me only at home." He described father picking him up and dropping him, as well as hitting him when they were out in the street or in the car. J.B. stated father would hit him with an open hand, feet, or a belt. He said the abuse usually occurred when father arrived home from work. J.B. stated, "[Father] would usually hit me when he comes home from work. I'm asleep on the top bunk bed, and he would wake me up to make him lemonade or he would tell me to fix the clothes on my bed or look for his slippers." J.B. also recalled mother and father fighting. He reported father would slap mother in the face, making her cry.

The CSW also interviewed father who stated, "Yes, blah, blah, blah, I know how the system works; your only concern [*sic*] on how I treat the child and you don't see his behavior at school." Father went on to admit that he did physically hit J.B., but stated, "I want to make it clear that if I hit him it was for a reason." He added, "yes I did all of that but it was a mistake." He said his stepson was "a big liar." He provided the same explanation regarding the domestic violence allegations, telling the CSW, "And again I let you know if I hit her it was for a reason." Father said those incidents were in the past and that he and mother were happily married.

The maternal grandmother and maternal uncle also provided additional information regarding father's physical abuse of J.B. and mother. The maternal uncle reported seeing marks and bruises on J.B.'s body every time he saw the child. The maternal grandmother recalled witnessing father hit J.B., causing his nose to bleed.

DCFS informed the juvenile court that mother passed away on June 16, 2012. DCFS reported that children were doing well in the maternal aunt's home and that J.B. refused placement in any other home. The maternal aunt and her husband were willing to care for the children. DCFS recommended the juvenile court vacate its home-of-parent mother order and order the children detained with the maternal aunt.

On August 13, 2012, the juvenile court sustained the petition and declared the children dependents of the court. The sustained petition read as follows: "(a)(1) [also (b)(1)(j)(1)]: On 05/01/12, the children [J.O.H.] and [B.B.]'s mother, [J.T.B.'s] male companion, [Pedro B.], father of the child [B.B.], physically abused the child [J.B.] by repeatedly striking the child's body with a belt, inflicting pain and bruises to the child's arm and torso, causing the child to fall to the floor. The [B.B.] father repeatedly kicked the child's body while the child lay on the floor. The [B.B.] father pulled the child up by the child's hair, repeatedly striking the child's face, inflicting a bloody nose. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The child is afraid of the [B.B.] father and does not wish to return to the family home. The children's mother failed to protect the child when the mother knew or reasonably should have known that the child was being physically abused by the [B.B.] father. Such physical abuse of the father by the ]B.B.] father and the m other's failure to protect the child endangers the child's physical health and safety and created a detrimental home environment placing the child and the child's sibling, [B.B.] at risk of physical harm, damage, danger, physical abuse and failure to protect."

"(a)(2) [also (b)(2)(j)(2)]: The children's [J.O.] and [B.B.]'s mother, [J.B.] and the mother husband [Pedro B.], father of the child [B.B.] have a history of engaging in violent altercations in the presence of the children. On prior occasions, the father slapped mother with an open hand making mother cry in the presence of the children. Such conduct on the part of her husband and failure to protect by mother endangers the children's physical health and safety and places the children at risk of physical harm, damage and danger."

J.B. and B.B. were removed from father's custody and placed with their maternal aunt. The juvenile court ordered family reunification services for father, including individual counseling with a DCFS-approved counselor, parenting classes, and domestic violence counseling. Father's visits with B.B. were to be monitored.

DCFS later reported it had located J.B.'s actual father, who was willing to take custody of his son. J.B., however, did not have a relationship with his father and did not

6

want to live with him. He told DCFS he would run away if placed in his actual father's home. DCFS recommended the juvenile court provide J.B.'s father with family reunification services, including conjoint counseling to resolve JB.'s issues of abandonment and reunification.

In its February 2013, status review report, DCFS noted J.B. and B.B. continued to reside with the maternal aunt and her husband. B.B. and father continued to have visits that were primarily monitored by the paternal aunt, who reported the visits went well. B.B.'s paternal uncle also monitored a couple of visits and reported that B.B. enjoyed visiting father. B.B. informed DCFS she would like to have overnight visits at father's home. J.B. met with his actual father, but apparently had no interest in communicating with him.

DCFS reported father was enrolled in domestic violence counseling and had attended 18 sessions. His counselors informed DCFS that father was making progress in an acceptable manner in group sessions and was focused on developing a healthy relationship with B.B. Father also was participating in the Fatherhood Program at Children's Institute, Inc. Father completed his individual counseling through All Peoples Community Center. Father also completed a 26-week anger management course.

DFCS stated father was in compliance with his court-ordered services and his visits with B.B. were proper. It recommended that B.B. remain placed in the home of the maternal aunt because father needed to progress further in his domestic violence counseling. DCFS also wanted father to have unmonitored visits with B.B. before it recommended return to father's custody.

On April 19, 2013, father's domestic violence counselor provided a detailed report regarding father's progress in About Face, a domestic violence program, as requested by father's counsel. The report said that father "denies any history of domestic violence in the relationship with his wife . . . ." It was stated that father had talked "in detail about his case." The report stated father acknowledged "having lost control when he physically hit [J.B.] and accepted that his abusive behavior only made matters worse" The report added that father continued to discuss J.B.'s behavioral problems at home and at school

as reasons why father physically hit the child. Father told his counselor that J.B.'s behavior worsened after his mother's death. The report said that father was "remorseful" and that he is willing to make behavioral changes.

The counselor said, "I am not able to determine whether [father] is a risk for his child. I see him in group therapy sessions once a week for two hours, therefore, unable to assess risk factor. Individual psychotherapy sessions would be an appropriate treatment modality to make this assessment."

In its July 19, 2013, status review report, DCFS stated J.B. and B.B continued to reside in the home of the maternal aunt and her husband; B.B. continued to have monitored visits with father; father continued participating in classes at Project Fatherhood; and father reported he only needed seven more sessions in order to complete his domestic violence counseling.

B.B. was participating in individual therapy at home. She had attended therapy for eight months and worked on issues surrounding the death of her mother and separation from father. Her therapist reported she was progressing and showed no behavioral or emotional problems.

Both father and B.B. continued requesting unmonitored visits with one another. B.B. said she would like to live with her father. Father told a CSW he now understood how much harm he had caused because of the manner in which he disciplined J.B. Father stated the children were suffering from the loss of their mother and he felt he was to blame because he previously did not know how to parent them.

Father's domestic violence program, About Face, provided another progress report on August 31, 2013, in which the clinical director of the program concluded that in her opinion, father had not benefitted from counseling. She believed father had been deceptive, always discussing his actions toward his stepson and never disclosing any information regarding domestic violence perpetrated toward his wife. At the October 23, 2013, contested 12-month review hearing, the juvenile court found father was in partial compliance with his court-ordered services and continued the matter for a section 366.22 hearing on December 18, 2013.

About Face provided another progress report in which the director did not recommend unmonitored visits for father and B.B. for several reasons: when father was asked about his domestic violence history with respect to his deceased wife, he replied that it was in the past and his wife was dead; she had concern about father "selectively choosing" what he disclosed in group session; and father attended 38 group therapy sessions and did not mention his domestic violence past or show empathy for his actions directed at his stepson, or how his wife might have felt watching him abuse her son. The director wrote "[Father's] focus throughout his participation in the program was on getting custody of his daughter back, period." The director concluded, "In my professional opinion, [father] has no empathy or any idea how his behavior has affected his family. I am recommending that he repeat 38 sessions to make up for the sessions he sat in and not mentioning his history of domestic violence, as well as marking his time in the program."

On December 5, 2013, Bernie's Lil Women Center Inc. Outpatient Drug Free Treatment Center (Bernie's) provided a letter to the juvenile court indicating father had enrolled in their program on October 31, 2013. He was participating in individual counseling and domestic violence classes. Father's counselor reported father appeared willing to "immerse himself in individual therapy sessions" and had "an open mind" and "high level of honesty."

At the February 26, 2014, contested section 366.22 hearing, which is the subject of this petition for an extraordinary writ, father testified that his family had come to the attention of the juvenile court and DCFS due to issues of domestic violence and his inappropriate disciplining of J.B. Father candidly told the court he would hit J.B. with a belt, kick him, and pull his hair. He stated, "I exploded. I couldn't hold it any longer." Father acknowledged that this conduct was not discipline but rather abuse. He also admitted previously stating there were reasons why he physically hit J.B., but testified that while J.B. had misbehaved, the resulting abuse was father's fault. Father stated that he is learning from his mistakes. He testified that things were now different because he had the tools and knowledge as to what to do and not to do. He explained that, "there

9

should be communication, assertive one, without offending the child. And that is now inside my heart."

Father testified that in the past, he physically abused B.B. as well and that she was present when he physically abused J.B. He had since spoken to B.B. and explained to her that the manner in which he disciplined J.B. was not healthy. Father stated it was not okay to discipline his children the way he had because it traumatized them.

Regarding domestic violence in his relationship with mother, father testified there were "more or less" two such incidents. He then recalled an incident where he threw a mirror at mother and stated, "So there were about three very strong incidents." Father testified he had learned a lot in his domestic violence program and understood that there was to be no power or control in a relationship and that both parties were to be treated equally.

When asked about his attempt to exert control over mother by telling her to leave the hospital, father replied, "Well, I mean, that she will be taken out of the hospital." When counsel for DCFS asked whether he recalled telling mother to leave the hospital, father stated, "Well, if they say so, you know, we'll accept it. I'm not justifying myself. I mean, if it's written down, then, I believe it. Father testified he now controlled his temper by utilizing deep breathing techniques.

Counsel for DCFS argued that B.B. should not be returned to father's custody, noting that a parent's failure to make substantive progress in their court-ordered case plan was prima facie evidence of detriment. She noted that while father had learned some things from his participation in various programs, B.B. had only participated in monitored visits with father, and it was uncertain, based on father's testimony, that he could "go from beating a child so badly to taking a deep breath and having a calm conversation." Counsel for DCFS also addressed the October 2013 letter from father's domestic violence program and noted that since that time, father had started counseling at Bernie's, but that father's counselor's recommendation was against unmonitored visits.

B.B.'s counsel argued father said "most of the right things," but she questioned the sincerity of some of his statements." She, too, referenced the October letter from About

10

Face and argued that it was interesting that father had suddenly decided to take responsibility. She argued father was disingenuous.

Father's counsel argued that father testified well in court and that father commenced a new domestic violence program in October 2013. She also discussed his consistent visitation with B.B., noting father had been interacting with B.B. for 15 to 20 hours per week being watched by various family members. The juvenile court continued the matter to "mull over" what it was going to do.

On March 5, 2014, the juvenile court stated that one problem facing the court was the fact that father only had participated in monitored visits with B.B. The juvenile court ordered unmonitored visits with B.B. and said "the Department is to use its discretion in liberalizing those unmonitored visits." The juvenile court said "I'm hoping that we can return this child back to the father." The juvenile court found that return of B.B. to father's custody would present a substantial risk of harm to the child. The juvenile court terminated reunification services and, ordered unmonitored visitation, set a section 366.26 hearing for July 2, 2014, and ordered that the permanent plan of placement was to be with the material aunt—presumably at least until the next hearing. The court set the matter for a section 366.26 hearing. Father filed a notice of intent to file a writ petition and filed the petition.

## DISCUSSION

In this petition, father contends there was insufficient evidence to support the juvenile court's finding that B.B. could not safely be returned to his custody.

### A.    Section 366.22 and Standard of Review

Section 366.22 states in pertinent part: "After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a

11

substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  [¶]  If the child is not returned to a parent . . . at the permanency review hearing, the court shall order that a hearing be held pursuant to Section 366.26 in order to determine whether adoption, guardianship, or long-term foster care is the most appropriate plan for the child. . . .  The court shall also order termination of reunification services to the parent. . . .  The court shall determine whether reasonable services have been offered or provided to the parent[.]"

This court reviews a permanency review order according to whether substantial evidence supports the juvenile court's findings.  (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400-1401; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341; *In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)  An appellate court determines only whether substantial evidence, contradicted or uncontradicted, supports the trier of fact's conclusion, resolves all conflicts in favor of the juvenile court's determination, and indulges all legitimate inferences to uphold the juvenile court's order.  (*In re John V., supra,* at p. 1212.)

We cannot reweigh the evidence and invoke our judgment over that of the juvenile court.  "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence.  We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence.  [Citation.]  Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.  [Citation.]"  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

### B.     Substantial Evidence

The following is evidence in the record.  Father employed violent behavior against his children, wife, and maternal grandmother.  He struck J.B. on a number of occasions and verbally abused him.  He admitted to striking mother, and he had physically abused

B.B. and maternal grandmother. His abuse of mother and maternal grandmother was in front of the children. Both J.B. and maternal grandmother expressed fear of father, and J.B. refused to return home.

Initially, father expressed no remorse for his actions and was not cooperative with DCFS. He even insisted mother leave the hospital against the advice of doctors. When he did speak to a social worker, he admitted abusing mother and J.B. but tried to justify his actions.

As a result of his conduct, the children were declared dependents of the court, removed from father's custody, and father was ordered to complete court-ordered services, including parenting classes, individual counseling, and domestic violence counseling. While he participated in several programs, he made little progress toward eliminating the issues that initially brought his family within the jurisdiction of the court.

The counselor from the domestic violence program, About Face, at which father was attending, sent two progress letters, both indicating that father had not benefitted from counseling. The director described father as deceptive, stating he only discussed his actions toward his stepson and never disclosed any information regarding domestic violence against his wife. In the director's professional opinion, she felt father had no empathy or any idea how his behavior affected his family. The counselor expressed concerns about the father's participation and attitude and said that his focus "was on getting custody of his daughter back, period."

Father claimed he has learned to control his anger. B.B.'s counsel suggested father was "disingenuous." Counsel for B.B. and DCFS both referred to father's tendencies toward violence and the progress reports from About Face, and questioned whether father had genuinely addressed his anger issues.

The juvenile court, by its order, indicated it did not believe that father had dealt with his anger management issues. In short, there is evidence father physically abused members of his family and did not take responsibility for such actions. Separate progress reports from programs he attended questioned his progress. Father's testimony was the

only evidence in support of his position, and, as noted, the daughter's attorney expressed that the testimony was disingenuous.

By authorizing the continued removal of a child from parental custody based on the risk of physical or emotional detriment, section 366.22 focuses on the child's well-being at the time of the review hearing and not on the initial grounds for juvenile court jurisdiction. Whether to return the child to parental custody ultimately depends on the effect that action would have on the physical or emotional well-being of the child. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) That father had resorted to violence against his family over a period of time and progress reports from his counseling programs questioned his progress in changing his behavior constitutes sufficient evidence supporting the juvenile court's orders.

Father points to the juvenile court's discussion of father's lack of unmonitored visits as the basis of its decision. The juvenile court, by such discussion indicated its concern with father's behavior that had not been tested in unmonitored settings. We uphold an order if it is supported by substantial evidence regardless of what the juvenile court may have said was its reasoning. (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1256, fn. 8.)

There is substantial evidence supporting the juvenile court's decision that B.B. cannot safely be returned to father's custody. Based on the record, and, as we must, looking to just the evidence supporting the juvenile court's decision and disregarding evidence to the contrary (see *In re John V., supra,* 5 Cal.App.4th at p. 1212), we deny the petition for a writ.

14

## DISPOSITION

The petition is denied.

NOT TO BE PUBLISHEDI N THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.