Filed 1/23/25  In re R.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.M. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E083854 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2400125) |
| v. | OPINION |
| A.M. et al., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant A.M.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant J.M.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

Defendants and appellants A.M. (Mother) and J.M. (Father; collectively, Parents) appeal from the juvenile court's jurisdictional and dispositional orders concerning their 10-year-old daughter, R.M. (Minor). Mother does not dispute the court's jurisdictional finding she failed to protect Minor from Father, only the court's disposition removing Minor from her custody. Father challenges the sufficiency of the evidence to support the court's finding that dependency jurisdiction was necessary based on his conduct, and he "joins in and adopts" Mother's arguments against removing Minor from parental custody. As we explain *post*, in light of the standard of review, there is no merit in Parents' appellate contentions. We therefore affirm the juvenile court's orders.

**FACTUAL AND PROCEDURAL HISTORY**

"Consistent with the standard of review, we set out the facts in the light most favorable to the juvenile court's order[s]." (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1121 [" ' "All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact" ' "].)

While a workplace violence restraining order was already in place barring Father from the grounds of Minor's school due to Father stalking staff members, plaintiff and respondent Riverside County Department of Public Social Services (the Department) received multiple referrals in February 2024 stating concerns for the child. Two or three times a week Father would call Minor on her cell phone and direct her to leave class and

the campus without permission. He would wait across a busy street, which she crossed on her own, and pick her up on his scooter. Mother was informed of Minor's unauthorized departures and refused to address them, despite repeated requests for meetings, which Mother ignored.

Meanwhile, Minor's conduct at school had deteriorated while the class was working on Black History Month projects. She had previously had to change classes because one of her teachers was Black, apparently at Father's insistence given her in-class defiance included statements such as: " 'My dad says I don't have to do anything you say because you're a monkey.' " She still refused to comply with teacher instructions, citing her Father's directions. Mother would not attend meetings on this issue either. During this time, Minor complained of stomach aches, cried, and told her teacher, " 'I am just so stressed.' "

A third referral the next month alerted the Department to an incident across the street from the school, wherein Father assaulted an elderly man in a pharmacy parking lot. Father then raced away on his scooter, leaving Minor behind initially, with her chasing him "for an entire block," before he returned to collect her and take her home. Many of Minor's classmates and their parents witnessed the incident; Mother was contacted but did not respond to calls or emails.

The incident was captured in video footage and "it was all over social media," which a social worker reviewed and summarized. The videos showed Father taunting the elderly man from his motorbike, punching the elderly man in the face multiple times, and knocking him to the ground where he lay unconscious—all in close proximity to Minor.

Department attempts to reach Mother after the incident were unsuccessful, but messages were left for her.

The next day a social worker made contact with Mother at school pickup. Advised again of the incident the day before, Mother sought to "stay out of it," but the worker explained that she was necessarily "involved, [because Minor] was present and her safety was placed at risk, as she was standing close to the elderly man when he was knocked to the ground." In a subsequent interview, Mother acknowledged she did not know how Minor got home after the incident that day. Mother claimed Father "would no longer be picking up or dropping off [Minor] at school," but he continued to do so.

Father's own child welfare history included "being assessed as psychotic with ADHD," commitments "in and out of day mental health programs . . . and [a] psychiatric hospital," plus, "in 2009, . . . concerns [he] was on a 5150 hold due to homicidal ideation." The previous investigation included reports Father suffered from childhood schizophrenia, that he was frequently institutionalized, and that multiple relatives had restraining orders against him. Minor's paternal grandfather later conceded obtaining a restraining order against Father, but suggested it was "twenty years ago" and "all water under the bridge now."

The Department took Minor into protective custody, which the juvenile court at the ensuing detention hearing upheld. The court also found Minor's continued out-of-home placement remained necessary. The previous day the Department filed its petition seeking the juvenile court's dependency protection for Minor on grounds she was at risk

of serious physical harm or illness in Parents' care. (Welf. & Inst. Code,[1] § 300, subd. (b)(1).)

Subsequent social worker interviews with Minor included her assessment that Father suffered from depression because of his rough childhood and that he "needs help" with his anger. Her insights, however, collided with her filial interest in protecting him. She recognized his temper resulted in a restraining order when he had "gotten angry with my school," which she struggled to understand ("I don't really know why"). Parroting Father, she attributed the restraining order to a lone, unintentional incident: " 'One time he had his one wheel scooter at my school and . . . accidentally kicked it in the direction of a school staff member's leg. He said it was an accident and he was just trying to move it out of the walk way.' "

Similarly, while she had told Mother about the incident with the elderly man, when Minor was later interviewed by a social worker she initially said she didn't remember the incident. Then, recognizing that " '[e]veryone else thinks my dad punched him,' " she insisted " 'he didn't.' " Instead, Father was just " 'yelling "get back" at the old man,' " who " 'somehow then fell on the floor.' " Her account was more dramatic in a subsequent interview in which the older man started " 'punching [her] father,' " Father was " 'trying to get him off of him and the man then fell.' "

Mother also believed it to be "untrue" that Father physically assaulted the elderly man; she admitted she had not seen video footage of the incident. She justified not

_____

[1] All further statutory references are to the Welfare and Institutions Code unless specified otherwise.

5

returning calls from Minor's school about her daughter because the " 'principal tends to over exaggerate incidents.' "  She gave as an example claims that Minor "left school" grounds unsupervised and without permission, "when in reality she left because the school day was over."

Mother acknowledged Father needed anger management assistance and that he lacked impulse control.  Minor's maternal aunt also confirmed Father struggled with anger problems, but said he did not direct it at Minor.  Mother knew of the school's restraining order against Father, but attributed it to him riding his scooter on the sidewalk there.  The trial court's orders reflected that it did not credit accounts justifying Father's actions.

Father's criminal history, as documented by the Department, dated from 2023 back to 1994, and included, of particular relevance, a contempt conviction for disobeying a court order and four convictions for violating protective orders.  Other convictions included a 2002 misdemeanor conviction for "sex with Minor:  + OR - 3 years," misdemeanor aggravated trespass in 2001 and 2004, misdemeanor "possess/MFG/sell dangerous weapon" in 2003 and the next year a misdemeanor criminal threat offense with intent to terrorize.  His arrests for concerning, dangerous or antisocial behavior included felony rape upon intoxicated person in 2001, misdemeanor sexual intercourse with a minor, misdemeanor prohibited carry of a concealed firearm in a vehicle, misdemeanor "depict sexual conduct of child," and, in 2009, grand theft of a firearm.

Recent reports of Father's escalating aggressive conduct, in addition to attacking the elderly man in the parking lot and conduct necessitating the stay-away protective

6

order at Minor's school, included a May 2023 report to the police department for "malicious mischief." Police department records indicated Father engaged in an angry confrontation with a solicitor at his doorstep, "threatening to release his bullmastiff on him," and then threw the victim's phone to the ground, breaking it. When the police responded, the reporting party was no longer at the home, and no further action was taken. The police department confirmed to social workers that a criminal investigation remained open as to the recent 2024 incident between Father and the elderly man.

At the continued, combined jurisdictional and dispositional hearing in May 2024, the juvenile court sustained jurisdiction over Minor based on the following allegations, which, after interlineation, the court found true as to Father: "[Father] suffers from unresolved mental health issues in that he has a history of exhibiting violent, reckless and escalating behaviors, with the most recent incident occurring on March 12, 2024. [He] physically assaulted an elderly man in the presence of [Minor] and left her unsupervised as he fled the scene. Additionally, [he] has a criminal history, . . . includ[ing] arrests and/or convictions for aggravated trespass, violation of protective/stay away order[s], contempt of court, rape upon intoxicated person and [*sic*] accused person knew, sexual intercourse with [a] Minor, carry concealed firearm in vehicle, depict sexual conduct of [a] child and grand theft-firearm. Further, [he] has failed to obtain the appropriate medical evaluation and/or treatment for his mental health issues, placing [Minor] at risk of serious injury, neglect, and/ or abuse."

As to Mother, the court made the following finding in support of jurisdiction: "[M]other knew, or reasonably should have known, that [Father] has unresolved mental

health issues and has a history of engaging in violent, reckless and escalating behaviors. [She] failed to intervene in the protection of [Minor] as she continued to leave [Minor] in the care of [F]ather, resulting in [Minor] witnessing [F]ather assaulting an elderly man and being left at the scene, placing [Minor] at risk of continued neglect and/ or serious injury."

On the cusp of the disposition hearing, the juvenile court placed Minor with Minor's maternal aunt and, at disposition, removed Minor from Mother's and Father's custody, vested custody with the Department, and authorized alternate placement options in the Department's discretion, consistent with the Department's concerns about placement with the aunt and the court's concerns about the aunt supervising visits. Father was not residing with Mother at the time, but was residing with the paternal grandfather.

## DISCUSSION

Father challenges the juvenile court's jurisdiction order while Mother contests only the court's disposition order removing Minor from parental custody, which Father also challenges. We address these contentions in turn.

As a preliminary matter, the Department argues that we need not address Father's jurisdictional challenge because Mother does not contest jurisdiction. The authority on which the Department relies, however, involved conduct by *both* parents independently warranting jurisdiction, including the mother's "drug abuse," and not just the father's actions. (*In re I.A.* (2001) 201 Cal.App.4th 1484, 1489.) Here, the Department's asserted basis for jurisdiction over Minor as to Mother consisted of what she "knew, or reasonably should have known," about danger posed to Minor by Father's "unresolved mental health

8

issues and . . . history of engaging in violent, reckless and escalating behaviors," and her failure to protect Minor despite that knowledge. Thus, because jurisdiction over Minor is premised fundamentally on risks posed by Father, we address his argument that no evidence supported the juvenile court's conclusion he endangered Minor.

The purpose of juvenile court dependency protection "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited." (§ 300.2.) Dependency jurisdiction is also proper "to ensure the safety, protection, and physical and emotional well-being of children who are *at risk* of that harm." (§ 300.2, italics added; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.) A juvenile court's decision to assume dependency jurisdiction requires proof by a preponderance of the evidence that the child is a person described by section 300. (§ 355; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)

As pertinent here, dependency jurisdiction arises when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness" due to a parent's failure or inability "to adequately supervise or protect the child." (§ 300, subd. (b)(1).) This failure to protect the child from harm or illness may, but need not, be a result of an "inability . . . to provide regular care for the child due to the parent's . . . mental illness." (§ 300, subd. (b)(1).) Abuse or injury does not have to be inevitable before the juvenile court intervenes to protect the child. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) "The court may consider past events in deciding whether a child presently needs the court's protection." (*Ibid.*)

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) The burden rests on the appellant to demonstrate the evidence does not support the juvenile court's ruling. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) This is no easy task. "The substantial evidence standard is a difficult hurdle for an appellant or writ petitioner. 'If there is any substantial evidence, contradicted or uncontradicted, which will support the judgment, we must affirm.' [Citation.] A reviewing court is in no position to judge the credibility of witnesses or reweigh the evidence, and therefore must resolve all evidentiary conflicts in favor of the juvenile court's findings." (*D.M. v. Superior Court*, *supra*, 173 Cal.App.4th at p. 1128.)

Father's principal contention is that no evidence "demonstrate[d] that [Minor] has, because of his conduct, suffered serious physical harm or illness or is at substantial risk of such harm or illness." Related to this claim, he disputes the sufficiency of the evidence to establish he "currently suffers" from mental illness and, in any event, argues there is no "*nexus*" between his " 'unresolved mental health issues' " alleged by the Department and a risk of harm to Minor. Similarly, he disputes any connection between his " 'history of exhibiting violent, reckless and escalating behavior' " as alleged by the Department and "risk of harming [Minor]." He complains the Department simply "lump[ed] together" his "psychiatric hold and other events primarily from when Father was a minor" with "criminal conduct—mostly occurring remotely in time . . . and arrests for which he suffered no criminal convictions." These attacks fail on close examination,

10

particularly given the standard of review; substantial evidence supports the juvenile court's jurisdictional finding.

Father concedes as "True," as he must, that staff at Minor's school obtained a protective order against him and that "[o]ther persons have also obtained protective orders against him." The juvenile court no doubt was cognizant that protective orders only issue upon a credible threat of harm. (See, e.g., *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401; *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 327.) The court was not required to accept Father's—or by extension, Mother's or Minor's— explanations minimizing the school's protective order.

Father also concedes the juvenile court could rely on as evidence that he "exhibit[ed] violent, reckless and escalating behaviors" both: (1) an "aforementioned incident in May 2023" involving his reported attack on a solicitor at his door, and, as "[a]lso true," (2) his "physical altercation" with "a motorist as [Minor] watched." Taken together, these incidents in conjunction with the outstanding protective order supported the juvenile court's finding that Father engaged in a disturbing current pattern of increasingly threatening behavior.

Father's past mental health history and criminal conduct lent support to the juvenile court's determination that Minor was at risk. It was for the juvenile court to determine the relevance of that evidence and, in light of Father's ongoing current tendencies towards violent and reckless conduct, the court did not err in taking it into consideration. (Evid. Code, § 352; see generally *In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1249 [evidentiary matters committed to juvenile court's sound

11

discretion]; see also *In re I.J.* (2013) 56 Cal.4th 766, 773 [record must be viewed in light most favorable to juvenile court's determinations].)  Father's suggestion that he currently showed "no symptoms of mental illness" was belied by conduct that aligned with his past diagnoses and his own daughter's poignant, parentified assessment that he was depressed and angry.  No formal, expert mental health evaluation or testimony is necessary for juvenile court dependency jurisdiction.  (*Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202.)  Rather, the dispositive issue is whether the child is at risk of harm in the parent's care, which can be assessed with ordinary experience.  The juvenile court reasonably reached that conclusion here.

Father argues the evidence of his threatening or violent conduct towards others did not show a risk of harm *to Minor*.  He notes as to the incident with the elderly man that, though Minor watched, she "was not harmed."  But risk of harm is the relevant concern and the juvenile court reasonably could conclude that this culminating act of violence showed Father's disregard for Minor's safety.  That disregard manifested itself in small ways earlier that would not generally be sufficient on their own, such as routinely calling Minor out of her elementary school for unauthorized departures, requiring her to leave campus unescorted, crossing a busy street alone.  Father's attack on the elderly man showed where this thoughtlessness for Minor's safety could lead.

In his zeal to taunt and attack the elderly man, Father ignored Minor's close proximity to the fighting.  That she could have been struck by an errant blow or otherwise harmed was shown by the fact that Father knocked the elderly man to the ground close to her, and with sufficient force to render him unconscious.  Father gave no heed to Minor's

12

presence, instigated a fight nearby her that easily could have gone awry, and, even on his telling that his adversary was the aggressor, placed Minor within a zone of danger both by engaging in the fight and then by speeding away initially, leaving Minor unsupervised.

Father's invocation of a case in which a single instance of parental neglect did not warrant jurisdiction is not persuasive. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1026.) Instead, the altercation here was one more instance in a pattern of reckless and violent conduct, vividly illustrating the ongoing risk to Minor from Father's volatility. (See *In re Heather A.* (1996) 52 Cal.App.4th 183, 194-196 [court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child].) The trier of fact can infer " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) Nothing here indicated Father reformed or recognized any danger to his daughter in his conduct. On the contrary, he remained defensive, self-justifying, and in denial about the seriousness of his actions. (See *In re Gabriel K*. (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].) Substantial evidence supports the juvenile court's jurisdictional finding.

Mother's challenge to the court's dispositional order removing Minor from parental custody, in which Father joins, similarly fails.

Before the juvenile court may order a child physically removed from his or her parent's custody, it must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the Minor if the Minor were returned home, and there are no reasonable

13

means by which the Minor's physical health can be protected without removing the Minor from the . . . parent's . . . custody." (§ 361, subd. (c)(1); *In re Hailey T.* (2012) 212 Cal.App.4th 139, 145-146.) The parent herself or himself "need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. [Citations.] In this regard, the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

Mother argues the juvenile court should have ordered family maintenance services rather than removal. She contends release of Minor to her care and custody, conditioned on Father remaining out of the home as she agreed, and with unannounced visits and other in-home safety measures, would have been sufficient to safeguard Minor. "Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order." (*In re Cole C.*, *supra*, 174 Cal.App.4th at p. 918.)

Ample evidence supported the court's conclusion Mother was not up to the task of protecting Minor from Father. She previously promised to protect Minor from Father by ensuring alternate school pickup plans, but the promise was an empty one. She minimized Father's conduct, claimed school concerns about Minor's safety were exaggerated, and then, when those fears were realized, consistently sided with Father and disputed there was any need to protect Minor. The cases on which Mother relies are therefore distinguishable. (*In re I.R.* (2021) 61 Cal.App.5th 510, 516 [the mother was not in a relationship with the father]; *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 285-288 [parents expressly recognized harm and regretted corporal punishment]; *In re A.L.* (2017)

14

18 Cal.App.5th 1044, 1051 [no basis for jurisdiction nor, hence, for removal].)  On the contrary, as in *In re A.F.* (2016) 3 Cal.App.5th 283, the juvenile court here reasonably could conclude that "[i]n light of mother's failure to recognize the risks to which she was exposing the Minor, there was no reason to believe the conditions would not persist should the Minor remain in her home."  (*Id.* at p. 293.)

## DISPOSITION

The juvenile court's order assuming jurisdiction over Minor and removing Minor from Parents' custody is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                          J.

We concur:

RAMIREZ _____
                    P. J.

MENETREZ _____
                        J.

15