Filed 10/15/25  In re Anais R. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ANAIS R. et al., Persons Coming Under the Juvenile Court Law. | B341377 (Los Angeles County Super. Ct. No. 23CCJP04244) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. LUIS R., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Syna M. Dennis, Juvenile Court Referee.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

Luis R. (Father) appeals from the juvenile court's jurisdiction findings and disposition orders declaring two-year-old Anais R. and one-year-old twins Leeana R. and Arlette R. dependents of the court under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (e), and (j).[1] Father challenges the court's findings that when Arlette was three months old, she suffered severe, acute, non-accidental physical trauma resulting in subdural and retinal hemorrhages while under the care of Father and mother, A.J. (Mother).[2] The court did not determine which parent caused Arlette's injuries, instead finding one of the parents physically abused Arlette and the other parent should have known of the abuse. On appeal, Father contends these findings and the disposition order removing the children from Father's custody were not supported by substantial evidence. We affirm.

_____

[1] Further statutory references are to the Welfare and Institutions Code.

[2] Mother submitted to juvenile court jurisdiction over the children and waived her appellate rights; she is not a party to this appeal.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Referral and Petition*

On December 4, 2023 the Los Angeles County Department of Children and Family Services (Department) received a referral alleging physical abuse of then-three-month-old Arlette by an unidentified perpetrator.  The previous night Arlette was brought to Children's Hospital Los Angeles because she was experiencing seizures; it was Arlette's second hospitalization within a week for seizures.  The hospital determined she suffered severe, acute, non-chronic subdermal hematomas and bilateral retinal hemorrhaging inflicted by physical trauma.  On December 7 the Department placed a hospital hold on Arlette and took Leeana and Anais into protective custody.

On December 11 the Department filed a petition on behalf of Arlette, Anais, and Leeana under section 300, subdivisions (a), (b)(1), (e), and (j).  The petition alleged for each count that Arlette had been hospitalized and suffered from "severe, acute, non-chronic subdermal hematomas[3] at different stages of healing," and her injuries were "consistent with force trauma."  Further, the parents' explanation for Arlette's condition was inconsistent with her injuries, and the injuries "would not ordinarily occur

---

[3]    A "hematoma" is "a mass of usually clotted blood that forms in a tissue, organ, or body space as a result of a broken blood vessel."  (Merriam-Webster's Online Dict. (2025) <https://www.merriam-webster.com/dictionary/hematoma> [as of Sept. 9, 2025], archived at <https://perma.cc/DP8B-T94B>.)  The Department generally uses the term "hematoma" to refer to Arlette's brain injury; the relevant medical reports generally use the term "hemorrhage" to describe the same condition.

except as the result of deliberate, unreasonable and neglectful acts by the child's parents who had care, custody and control of the child." The petition alleged the parents knew or should have known Arlette was being physically abused and failed to protect her, and their neglect endangered Arlette, Anais, and Leeana.

On December 12, 2023 the juvenile court detained the children from the parents and ordered monitored visitation. As of February 2, 2024, the three children were placed with maternal aunt Ramona J.

B.    *Arlette's Hospitalizations and the Department's Investigation*

1.    *Arlette's injuries and hospitalizations*[4]

a.    September 2023

In early September 2023 Arlette and her sister Leeana were born healthy and slightly premature at 36 weeks of gestation. Hospital records show Mother, then 22 years old, following the twins' births suffered from a postpartum hemorrhage and blood loss, fever, and severe anemia, and was placed in the intensive care unit for two weeks. Arlette and Leanna were placed in a neonatal intensive care unit for three days and then discharged to Father.[5] Mother acknowledged she did not receive any prenatal care.

---

[4]    Because the juvenile court based its jurisdiction findings on only Arlette's abuse, we do not discuss the evidence regarding Anais's and Leeana's health and welfare.

[5]    The hospital's discharge instructions included a fact sheet on shaken baby syndrome, describing it as a "a set of severe brain

4

The family moved into the home of paternal grandmother, Linda R. Mother, Father, and Anais shared a bed while Arlette and Leeana slept in a crib in the same room. Mother reported she was the children's primary caregiver, and Father typically worked Monday through Saturday from early morning until late at night. Linda and maternal grandmother, Cristina D., also provided occasional care for the children.

      b.     October 2023

On October 26, 2023 then-eight-week-old Arlette was brought to Adventist Health White Memorial Hospital (Adventist) emergency department due to a three-day history of fever and cough and a "belly button problem." An initial examination indicated a soft reduceable umbilical hernia, and Arlette tested positive for respiratory syncytial virus (RSV). The family departed before the hospital could share test results and provide discharge instructions.

On October 28 Arlette returned to Adventist because of coughing spells, decreased food intake, and vomiting. After an

---

and eye injuries that occur when a young child is shaken vigorously or suffers blunt impact." The condition can result in "[b]leeding between the brain and skull . . . called subdural hematoma," with serious consequences, including brain damage and death. Symptoms include "uncontrollable crying," "loss of consciousness," "having a hard time staying awake," "changes in behavior," "being very irritable," "difficulty breathing," "paleness or a blue or gray color to the skin," "vomiting," "convulsions," "difficulty nursing, or eating," and "paralysis." (Capitalization omitted.) The record does not reflect whether the parents received or read the discharge instructions.

initial examination in the emergency department and while waiting for a pediatric consultation, Mother complained about the delay and left with Arlette.

c. November 2023

On November 4, 2023 Arlette was brought to Children's Hospital after three days of increased cough, labored breathing, and vomiting. She was admitted for two nights, during which time she received intravenous fluids and antibiotics for possible pneumonia. Arlette tested negative for influenza, RSV, COVID-19, and pertussis (whooping cough). Arlette was discharged with a seven-day course of antibiotics and instructed to follow up with a primary care physician in one to three days, but according to a subsequent report, the parents did not provide documentation of a follow-up appointment.

On Wednesday, November 29, in response to a 911 call, Arlette was taken by ambulance to Los Angeles General Hospital following a reported episode of decreased responsiveness, cessation of breathing, paleness, limpness, and "'twitching for 30-40 seconds with eyes rolled back and fluttered.'" By the time emergency services arrived at the family home, Arlette was back to baseline, but Mother allowed the ambulance to bring Arlette to the hospital. An examination showed Arlette did not have a fever, although she had mild pallor (abnormal paleness). Arlette tested positive for RSV and OC43 (a variety of coronavirus that is not COVID-19). Arlette was discharged in stable condition the following day.

When the social workers and members of a Children's Hospital CARES Center[6] team later interviewed Mother about the November 29 incident, Mother reported that Arlette had been in her crib around 6:00 p.m. when Father went in to change Arlette's diaper. After Father told Mother that Arlette had a slight fever, Mother joined Father in the room and gave Arlette baby acetaminophen, then left. Father then immediately called out to Mother, saying Arlette was not breathing, and Mother and Linda ran into the room. According to Mother, Father was panicking, and Mother called 911 but handed the telephone to Linda because Mother had to soothe Anais, as well as Linda's four-year-old child. The 911 operator guided grandmother through chest compressions. Mother believed Arlette stopped breathing for 30 seconds, and Arlette looked pale and limp. By the time paramedics arrived, however, Arlette was breathing normally, and the paramedics told Mother there was nothing wrong but they would bring Arlette to the hospital, where she stayed overnight for observation.

---

[6] According to the Children's Hospital Los Angeles's website, the hospital's CARES center "provides services for suspected victims of child abuse and their families," and its "medical experts provide comprehensive medical evaluations for suspected child abuse cases in the hospital." (Children's Hospital Los Angeles, General Pediatrics: Child Abuse - CARES Center (Sept. 2025) <https://www.chla.org/general-pediatrics/child-abuse-cares-center> [as of Sept. 9, 2025], archived at https://perma.cc/NWY7-YS6E >.)

d.     December 3, 2023

On December 3, 2023 the family brought Arlette to Children's Hospital "due to a reportedly unprovoked 20 second apneic episode (stopped breathing) with associated pallor." A nurse in the emergency department witnessed another apneic episode. There were no reports of cough, congestion, runny nose, difficult breathing, vomiting, diarrhea, or rash, although Arlette's respiratory panel tested positive for coronavirus OC43. Arlette was admitted for further evaluation, and an examination showed a notable increase in Arlette's head circumference since her prior admission at Children's Hospital on November 4, but there were no external signs of trauma.

On December 4 and 5 CT and MRI scans of Arlette's head and brain were performed, and the pediatric neuroradiologist found "acute subdural hemorrhages involving the right frontal-temporal regions along the tentorium (part of the dura between the cerebrum and the cerebellum)" and also "bi-lateral frontal, parietal, and temporal subdural collections with associated membranes indicative of older subdural hemorrhages." An ophthalmological examination further found "bilateral non-confluent retinal hemorrhages involving the macula, the nerve fiber layer, and scattered in the periphery in all four quadrants." (Capitalization omitted.) Laboratory studies, including a pediatric hematology consultation, revealed no evidence of a clinically significant bleeding disorder or underlying metabolic disorder that could account for the hemorrhages. According to a pediatric neurosurgery consult, no surgical intervention was indicated, but Arlette developed subclinical seizure activity due to her head injury, which was treated with anticonvulsant medication.

8

Arlette's family reported no pertinent history of trauma to the Children's Hospital staff, leading the hospital to notify child welfare authorities of suspected "non-accidental/inflicted trauma." When the Department and CARES team later interviewed Mother about the events of December 3, Mother stated that Arlette woke from a nap at 11:00 a.m. and finished her bottle in her crib. Mother was cleaning Anais's high chair in another room, so she asked Father—who was out from work that day due to back pain—to remove the bottle and clean up the crib. Father reportedly picked up Arlette and set her back down, and Arlette immediately started crying. Mother entered the room to soothe Arlette, but the baby's cries grew louder. Mother observed Arlette had become pale, and she went stiff "with her arms in fists flexing straight out [and] with legs straight out and toes pointing out." Arlette stopped breathing "'for a little bit,'" prompting Mother to do two chest compressions and administer rescue breathing. Arlette was crying and gasping for air. Mother did not want to call 911 because of her prior experience with the paramedics, so she asked Linda to drive her and Arlette to Children's Hospital. When the social workers asked about any drops, traumas, or other injuries to Arlette, Mother recalled one incident about a month earlier when Arlette and Leeana were playing on their stomachs and Arlette "bonked" her head into Leeana, causing Arlette to cry. Arlette did not have any other reaction from the incident.

On December 15 Arlette was discharged to a foster placement under Department supervision. At that time, Arlette was in stable condition on her anticonvulsant medication and was no longer suffering from seizures.

9

e.    January through June 2024

In early 2024 Arlette joined her sisters in their placement with maternal aunt Ramona.  Arlette had numerous follow-up appointments over the following six months.  An MRI scan in February showed "near resolution" of the hematomas, and a May scan showed "interval resolution."  A March ophthalmological follow up indicated the retinal hemorrhages had also resolved.  A June developmental screening noted that Arlette showed asymmetric use and strength of her extremities.  In the June 7, 2024 last minute information for the court, the Department reported the results of a recent neurology appointment, which showed the hematomas had resolved and brain growth and development was appropriate.  By that time, approximately two months had passed since Arlette's last seizure.

2.    *Dr. Imagawa's forensic report*

In July 2024 Dr. Karen Imagawa, director of the CARES Center, provided the Department and County Counsel with her final forensic report regarding Arlette's injuries.  In preparing her report, Dr. Imagawa reviewed and summarized Arlette's and Mother's hospital records from Arlette's birth and the records of Arlette's visits and treatment at Adventist, General Hospital, and Children's Hospital.

Dr. Imagawa stated that intracranial injuries, such as subdural hemorrhages, in infants from causes other than trauma are "rare."  "Subdurals can occur as a contact injury (i.e. blunt trauma to the head)" or "as a noncontact injury in which tension and/or shearing strains cause stretching and rupturing of the vessels that bridge from the brain to the dura (membrane inside of the skull around the brain), such as occurs with vigorous

10

shaking." Dr. Imagawa opined Arlette's injuries could be due to either or both of these mechanisms.

Further, Arlette's presentation at the hospital in December 2023 with acute subdural hemorrhages indicated she sustained injuries within a few hours to a few days earlier, while evidence of older subdural hemorrhages indicated injury that occurred more than a week or two earlier. In light of Arlette's unresponsiveness and apnea at the time of presentation, among other symptoms, Dr. Imagawa opined the acute subdural hemorrhage was related to a new episode of trauma rather than a re-bleed of the older injury. A re-bleed would also not account for the retinal hemorrhages: bilateral retinal hemorrhages were consistent with trauma that occurs with vigorously shaking an infant.

Dr. Imagawa expressed concern with the "bilateral older subdural hematomas." Based on the absence of evidence of birth trauma, the increase in Arlette's head circumference between her admissions to Children's Hospital on November 4 and December 3 was likely due to the development of the hematomas sometime after the November hospital admission.

Dr. Imagawa concluded, "The combination of retinal hemorrhages and subdural hemorrhage with no adequate history of trauma and no underlying medical condition are consistent and compatible with non-accidental/inflicted trauma."[7] Dr. Imagawa recommended close follow up and continuing

---

[7] Dr. Imagawa stated the incident reported by Mother where Arlette and Leeana bumped heads while playing on their stomachs over a month before their admission "is not a sufficient mechanism to explain Arlette's injuries."

neurologic intervention, because Arlette's asymmetrical use of her extremities could resolve or result in permanent disability. She added, "The previous lack of follow-up by the family with a primary care provider as recommended multiple times . . . may require further inquiry as this raises concern for neglect."

3.     *The Department's interviews with the family*

In Mother's initial interview with a social worker on December 5, 2023, Mother denied causing Arlette's injuries and denied knowing who caused the injuries. She also denied that Father or any other person residing in the family household caused the injuries. As discussed, Mother stated Father worked long days, six days a week, and he had a minimal role in the daily care of the children. Mother could not recall the last time Father cared for the children alone, although she also reported Father cared for them alone "this past Sunday" (i.e., December 3). Mother described Arlette as "'lazy'" and the "fussiest" and "'more serious'" of her children, and she said Arlette is fussy at all times if not being held.

In a January 4, 2024 interview, Mother reported that none of the children had any accidents while in her care, and she did not believe Arlette had been abused. Sometimes Arlette would "'throw her head' down" when she could not keep it upright, and Mother wondered if Arlette's injuries "'could be genetic[] or when she was born that something went wrong.'" Mother said Father assisted with caregiving on Sundays, including changing diapers, feeding the children, burping the children, and putting them to sleep. Linda also helped when Mother showered or went shopping. Father worked in construction Monday through Saturday from 6:00 a.m. until 10:00 p.m. or later, although he did

not have a set schedule. Mother never observed him do anything out of the ordinary.

In interviews on December 5, 2023 and January 4, 2024, Father denied causing Arlettte's injuries, knowing how she was injured, or who caused the injuries. Father worked six long days, and the children were asleep by the time he got home. Mother was the primary caregiver, and Father never saw Mother roughly handle or shake the children. Further, Mother would have told him if there had been an accident. He asserted that Mother was incapable of hurting the children. Linda and paternal aunt Alejandra R. helped Mother care for the children daily, but they did not say anything happened to Arlette, and Father had no concerns with anyone in the household. Mother and the children visited maternal grandmother, Cristina, every other week, but Mother was always present. Father denied he had any substance abuse, mental health, or domestic violence issues, and denied anyone in the household had those issues. He reported that Children's Hospital told the parents that Arlette's injuries could have been caused by "'something medical, like her coming out during birth,'" and he did not believe Arlette could have been the victim of shaken baby syndrome because there was no bruising or broken bones.

Linda reported she was home most days and helped care for the children when Mother needed help. Linda stated she did not cause Arlette's injuries, and she was unaware of any instance of Arlette falling or bumping her head. Linda denied seeing anyone shake, grab, or throw Arlette. She observed that Mother was very patient, calm, and loving with the children, including Arlette, who frequently got sick.

Alejandra lived in the paternal home and had daily contact with the children; in her interviews, she denied witnessing any accident or mistreatment. Cristina reported she saw Mother weekly and likewise denied witnessing any mistreatment or accidents. Cristina said Father was a "'good man,'" and she denied any issues between the parents.

Ramona reported that when Mother and Father were dating (before they had children), Ramona saw bruising on Mother and was concerned. Ramona "'tried helping her several times, but she and [Father] would always make up.'" Eventually Mother stopped confiding in Ramona about her relationship with Father. Ramana was "'unaware if there is any domestic violence since the children were born.'"

Los Angeles Police Detective Vanessa Chin told the social worker that she had interviewed Mother for two hours on January 4, and she believed Mother might be suffering from postpartum depression and posttraumatic stress disorder due to the trauma from the twins' birth. Mother told Detective Chin she was barely sleeping due to her need to care for three children (and sometimes a four-year-old paternal relative in the house), with "no support." Detective Chin felt Mother was overwhelmed and suspected she might have inflicted Arlette's injuries without intending to hurt her. Father did not cooperate in Detective Chin's requests for an interview and eventually stopped taking the detective's calls. On February 16 Detective Chin told the social worker there were "two suspects" in the criminal investigation, but she would need to obtain further information from the CARES team before proceeding.

In the October 4, 2024 last minute information for the court, the social worker reported that during the 10-month period

she worked with the parents, she suspected a history of violent behavior, but there was no concrete evidence of violence, and call logs did not show any domestic disturbance calls. The social worker also suspected Father had control issues, noting that Father tried to control Mother's means of transportation for visits and Mother statements that she would need to seek Father's permission to cooperate in the investigation. The Department also expressed concern "regarding the parents' potential collaboration regarding the concealment of the etiology of the child, Arlette's, injuries. Neither parent has provided a clear explanation consistent with the infant's injuries and it is unclear whether the parents are covering up for one, or both, of their actions which led to the injuries."

C.    *The Jurisdiction and Disposition Hearing*
        The petition provided notice that the Department intended to rely on section 355.1, subdivision (a), to assert the rebuttable presumption the children were subject to juvenile court jurisdiction due to intentional injury to Arlette.[8] At the October 10, 2024 jurisdiction and disposition hearing, the

---

[8]     Section 355.1, subdivision (a), provides, "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." The presumption affects the burden of producing evidence. (§ 300, subd. (c).)

juvenile court admitted the evidence offered by Department—including its own reports and the CARES teams reports and hospital records—and the exhibits offered by Mother and Father showing their participation in parenting classes and counseling.[9] No witnesses testified. The Department argued the evidence of Arlette's force trauma, the parents' sole custody at the time of each medical emergency, and their failure to offer any explanation for Arlette's injuries supported jurisdiction. Further, Anais and Leeana were likewise at substantial risk of harm based on Arlette's injuries, their presence in the home, and their young ages.

Minors' counsel asked the juvenile court to sustain the petition as pleaded, arguing Mother and Father knew or reasonably should have known Arlette had been abused, and there was no requirement that there be actual knowledge of abuse to sustain an allegation under section 300, subdivision (e). Mother was Arlette's primary caregiver, and although Father worked a lot, he had daily contact with Arlette and was caring for her on December 3, 2023.

Mother's attorney notified the juvenile court that Mother reached a settlement with the Department to submit on the evidence and waive her appellate rights; the court accepted Mother's waiver.

Father's attorney asked the juvenile court to strike him from the petition, asserting that Father rebutted the section 355.1 presumption because he denied injuring Arlette and

---

[9]     The juvenile court also considered the trial briefs filed by the Department, minors' counsel, and the parents, which made similar arguments to those presented at the hearing.

was rarely alone with the children.  Further, the Department failed to show Father knew or should have known about the abuse because he was not Arlette's primary caregiver, the family immediately took Arlette to the hospital, none of the physicians who examined Arlette alerted the family of signs of abuse (prior to December 3), and there was "no one—not the law enforcement, not the Department, not a single person—that even suspects father to be the perpetrator of any of the injuries."

Following the attorneys' arguments, the juvenile court sustained the petition on all counts, finding the Department sustained its burden by clear and convincing evidence.  The court found, "It's obvious that the minor suffered serious injuries that the medical professionals determined [were] not in an accidental manner and that the Father and the Mother did have custody of the child.  I can't say today which party or parties were responsible for the injuries, but to the extent that one party may not have been responsible for the injuries, the other party knew or should have known."

The juvenile court declared Arlette, Anais, and Leeana dependents of the court under section 300, subdivisions (a), (b)(1), (e), and (j), and ordered them removed from Mother's and Father's custody.  The court found by clear and convincing evidence there was a substantial danger to the children in the home.  The court ordered reunification services for both parents[10] with Father to attend parenting classes and individual

---

[10]     The Department had argued for bypass of Father's reunification services, but minors' counsel, Father's attorney, and Mother's attorney requested that reunification services be ordered.

counseling to address stressors, anger management, and appropriate parenting. The court further ordered monitored visitation for the parents three times per week for three hours each visit.

Father timely appealed.[11]

## DISCUSSION

A.  *Substantial Evidence Supports the Juvenile Court's Jurisdiction Findings Under Section 300, Subdivision (e)*[12]

1.  *Governing law and standard of review*

The juvenile court has jurisdiction over a child if the Department establishes by a preponderance of the evidence that

---

[11]  The Department contends Father's appeal is moot because jurisdiction is supported by the uncontested findings as to Mother. "[W]here a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot." (*In re D.P.* (2023) 14 Cal.5th 266, 283.) We decline to find Father's appeal is moot because he challenges the children's removal from his custody based on the jurisdiction findings against him.

[12]  Because substantial evidence supports the findings against Father under section 300, subdivision (e), we do not reach the juvenile court's findings under subdivisions (a) and (b)(1). (*In re I.J.* (2013) 56 Cal.4th 773 ["'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the

18

the allegations made pursuant to section 300 are true. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) Section 300, subdivision (e), provides that jurisdiction may be assumed over a child if "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." "'[S]evere physical abuse'" is defined to include, in relevant part, "any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness . . . ." (*Ibid.*)

An "abuse finding may be based upon circumstantial evidence showing that the parents knew or reasonably should have known about the abuse, even when it cannot be determined which caretaker inflicted the abuse." (*K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1382; accord, *In re E.H.* (2003) 108 Cal.App.4th 659, 670 (*E.H.*) ["where there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out. A finding may be supported by circumstantial evidence. . . ."]; see *In re A.S.* (2011) 202 Cal.App.4th 237, 245 ["[t]he conclusive identity of the perpetrator, however, is not a prerequisite of jurisdiction" under

---

reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'"]; accord, *In re M.R.* (2017) 7 Cal.App.5th 886, 896.)

19

§ 300, subd. (b)(1)], disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

Section 300, subdivision (j), provides for jurisdiction when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." The provision "accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.'" (*I.J., supra*, 56 Cal.4th at p. 774.)[13]

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted,

---

[13] On appeal, Father challenges only the sufficiency of the evidence supporting the juvenile court's findings as to Arlette's abuse; he does not contend the court erred in taking jurisdiction over Anais and Leeana based on the statutory factors in section 300, subdivision (j). Accordingly, that issue is forfeited, and we consider only the subdivision (e) findings. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [issue not raised on appeal "deemed waived"]; *Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 72 ["'"Issues not raised in an appellant's brief are [forfeited] or abandoned."'"].)

20

supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.""" (*I.J., supra*, 56 Cal.4th at p. 773; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633; *In re Gilberto G.* (2024) 105 Cal.App.5th 52, 62 [""We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding.""].) "However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602; accord, *In re S.F.* (2023) 91 Cal.App.5th 696, 713.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; accord, *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.)

2. *Substantial evidence supports the finding that Father abused Arlette or should have known of her abuse by Mother*

Father contends the juvenile court's jurisdiction findings with respect to him are not supported by substantial evidence because the court failed to consider possible causes of Arlette's injuries other than physical abuse. Further, Father argues that

21

to the extent Arlette was abused, "there is nothing in the record to suggest Father should have known that a relative whom he entrusted to care for his children would hurt Arlette." Substantial evidence supports the court's findings.

With respect to Father's first contention, the Department produced significant, undisputed evidence that Arlette suffered "severe physical abuse" as described in section 300, subdivision (e). On November 29, 2023 paramedics brought Arlette to General Hospital after she suffered seizures, cessation of breathing, pallor, and limpness. Just four days later, on December 3, Mother brought Arlette to Children's Hospital after Arlette suffered the same symptoms. Arlette stopped breathing in the emergency department, and an examination revealed that Arlette's head had swollen, increasing in circumference since her November 4 admission to the hospital. MRI scans and an ophthalmological examination confirmed that Arlette suffered subdural and retinal hemorrhages. Laboratory studies showed no evidence of a bleeding disorder or metabolic disorder that could have caused the hemorrhages.

Based on her review of Arlette's medical records, Dr. Imagawa opined the combination of the acute subdural hemorrhages and retinal hemorrhages indicated Arlette sustained brain injury "within a few hours to a few days prior" to hospitalization on December 3. The older subdural hemorrhages indicated Arlette suffered a discrete brain injury at least a week and possibly a month earlier. Arlette's injuries were consistent with either blunt force head trauma or vigorous shaking; other causes of such injuries were "rare." The family denied Arlette had any physical injury that could have caused the injuries, and there was no indication of birth trauma or "underlying medical

22

condition" that could explain the injuries. Dr. Imagawa concluded Arlette's injuries were "consistent and compatible with non-accidental/inflicted trauma." Although Arlette's hematomas resolved over several months, she experienced seizures through the winter of 2024, and as of June 2024, Arlette continued to suffer from asymmetrical use and strength in her limbs.

In the juvenile court, the parents did not challenge Dr. Imagawa's qualifications or opinions, nor did they introduce any evidence or expert opinions raising an alternative cause of Arlette's injuries. Instead, for the first time on appeal, Father contends the court failed to consider other possibilities, "all documented in the record," for Arlette's injuries, including respiratory viruses, "seizure activity which could have resulted from said viruses," apnea, and the chest compressions administered by the family during the apneic episodes. Although there is evidence Arlette suffered from viruses and apnea, and the family performed chest compressions, there is no evidence these conditions could have caused Arlette's injuries.[14] Moreover,

---

[14] In his opening brief Father cites three online publications to support his contention that a coronavirus or RSV could have caused Arlette's symptoms, and that the chest compressions could have produced her retinal hemorrhages. However, Father did not submit these publications in the juvenile court, and he has not requested we take judicial notice of the documents. Moreover, even if the publications were submitted in the juvenile court or were properly before us, absent an expert opinion that the infections could have caused Arlette's injuries, the publications would not rebut Dr. Imagawa's expert opinion they did not. We therefore grant the Department's June 12, 2025 motion to strike all references to these publications.

in Dr. Imagawa's review of Arlette's medical records, she noted Arlette's respiratory infections and prior apneic episodes but concluded there was no birth trauma, underlying medical condition, or other explanation for Arlette's injuries besides inflicted trauma.[15]

Father also contends there is insufficient evidence he inflicted Arlette's injuries or knew or should have known that Arlette was being abused. He asserts Arlette's caregivers were all trusted family members, he was rarely home, there was no perceptible sign of abuse, and none of the medical professionals who examined Arlette prior to December 3 raised the possibility of abuse. However, in light of Arlette's alarming symptoms while Father was home on multiple occasions (which on November 29 caused him to "panic"), Arlette's presentation on December 3 with new and old acute brain injuries, and the parents' living situation, the juvenile court's finding that one of the parents caused Arlette's abuse and the other parent knew or reasonably should have known of the abuse was supported by the substantial evidence.

As discussed, the family lived in a single room in Linda's house. Mother was Arlette's primary caregiver and was almost always with her. The only nonparent who was ever alone with Arlette was Linda, on occasions when Mother went shopping or was in the shower, but there is no evidence Arlette was alone with Linda in the days or hours leading up to Arlette's medical

---

[15] The evidence of older subdural hemorrhages occurring at least a week before the December 3 admission also undermines Father's speculation that the chest compressions on November 29 and December 3 could have caused Arlette's injuries.

24

emergencies. By contrast, although Mother and Father stated Father worked six days a week from dawn until around midnight, he was home and alone with Arlette on the two occasions when Arlette stopped breathing and experienced seizures: at around 6:00 p.m. on Wednesday, November 29, and around 11:00 a.m. on Sunday, December 3. Further, maternal aunt Ramona observed bruising on Mother early in her relationship with Father, and Mother no longer confided in Romona about Father.

As discussed, "where there is no identifiable perpetrator, only a case of suspects," a jurisdiction finding under section 300, subdivision (e), may be supported by circumstantial evidence that one of the suspects committed the abuse. (*E.H., supra*, 108 Cal.App.4th at p. 670; accord, *K.F. v. Superior Court, supra*, 224 Cal.App.4th at p. 1383.) If the law were otherwise, a "family could stonewall the Department and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding under [section 300] subsection (e)." (*E.H.*, at p. 670; accord, *In re A.S., supra*, 202 Cal.App.4th at p. 245 ["The prerequisite of a conclusive identification could lead to absurd results, the potential return of a seriously injured child to an unidentified perpetrator."].) Here, the social worker suspected that such stonewalling occurred in this case: Father closely controlled Mother and her interactions with the Department, giving rise to concerns "regarding the parents' potential collaboration regarding the concealment of the etiology of the child, Arlette's, injuries."

Our analysis in *E.H., supra*, 108 Cal.App.4th 659 is instructive. Three-month-old E.H. was taken to the hospital with a swollen thigh and was diagnosed with fractures of the ribs, wrist, femur, feet, hands, and hip in different stages of healing.

(*Id.* at p. 661.)  The parents cared for E.H. but denied that they or anyone else in the home had caused her injuries.  (*Id.* at p. 662.)  The father watched the baby while the mother was at school, and a maternal aunt watched the baby at other times.  (*Id.* at p. 665.)  Although the juvenile court found conclusive evidence E.H. suffered intentional injury by someone in the household, it dismissed an allegation under section 300, subdivision (e) (although it sustained the allegations under section 300, subdivisions (a) and (b)), because there was no finding as to which person inflicted the injuries.  (*Id.* at p. 667.)  We reversed the dismissal of the subdivision (e) allegation, agreeing with the Department's "'res ipsa loquitur' type of argument" that the combined evidence of intentional injury, the parents' exclusive custody of the baby, and the continual presence of family members was sufficient to sustain a finding under section 300, subdivision (e).  (*E.H.*, at pp. 679-670, fn. omitted.)  We explained, "The only reasonable conclusion to be drawn from the facts of the instant case was that someone in the home was causing E.'s injuries, and that [the parents] *reasonably* should have known (since they lived there) the identity of the perpetrator."  (*Id.* at p. 670.)  "Whether [the parents] actually *knew* E. was being injured by someone else is not required."  (*Ibid.*)

Father's reliance on our subsequent decision *In re Roberto C.* (2012) 209 Cal.App.4th 1241 (*Roberto C.*) is misplaced.  In *Roberto C.*, nine-month-old Roberto was hospitalized after he became unconscious while in the care of a babysitter, and the hospital concluded Roberto suffered a brain bleed and retinal hemorrhages from being shaken.  (*Id.* at pp. 1243-1245.)  The babysitter cared for Roberto outside of the home for almost eight hours a day, five days a week, for three weeks prior to his

26

hospitalization.  (*Id.* at p. 1245.)  At the jurisdiction hearing, the juvenile court dismissed the allegations under section 300 subdivisions (a), (b), and (e), finding there was no evidence linking the parents to the infliction of Roberto's injuries. (*Roberto C.*, at p. 1248.)  We affirmed, reasoning that although "someone caused serious injury to Roberto," the only evidence of any potential injury was minor bruising on the morning of his hospitalization, and there was "no evidence that provides any basis to attribute knowledge to these parents that Roberto was being abused . . . ."  (*Ibid.*)  We distinguished *E.H.* on the basis the parents in *E.H.* "reasonably should have known the identity of the perpetrator, as only family members had been involved in the child's care," and because E.H. cried frequently (which the family attributed to colic).  (*Roberto C.*, at p. 1255.)  By contrast, Roberto was a healthy and happy baby prior to his hospitalization, and "[o]nly the [Department] investigator, whose credibility the court seriously questioned, asserted the parents had been insufficiently vigilant with respect to Roberto's physical condition."  (*Id.* at p. 1256.)

The facts in this case are more akin to those in *E.H.* than *Roberto C.*  Arlette, like the baby in *E.H.*, was in the custody and care of Mother and Father at all relevant times, including the two occasions on which she suffered seizures and cessation of her breathing.  Arlette had acute injuries, and there was no other individual who could have caused her injuries, in contrast to

27

*Roberto C.*, in which the babysitter cared for Roberto outside the home.[16]

B.    *Substantial Evidence Supports the Children's Removal*

Father challenges the juvenile court's disposition order removing the children from his and Mother's care, arguing that substantial evidence does not support the court's finding the children would be in danger if allowed to remain with the parents.  Substantial evidence supported removal.

Section 361, subdivision (c)(1), provides: "A dependent child shall not be taken from the physical custody of their parents . . . unless the juvenile court finds clear and convincing evidence" there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no

---

[16]    *In re G.Z.* (2022) 85 Cal.App.5th 857, also relied on by Father, is readily distinguishable.  There, the court reversed the jurisdiction findings under section 300, subdivision (b)(1), because there was insufficient evidence that 10-month-old G.Z. suffered subdural hematomas as a result of abuse by the mother or anyone in the household.  (*G.Z.*, at pp. 863, 877.)  The mother reported two accidents where G.Z. fell on his head and introduced evidence he suffered medical conditions that rendered him susceptible to brain bleeds through normal handling.  (*Id.* at pp. 846, 877.)  Mother's expert testified G.Z.'s injuries were not consistent with shaking, and the Department's expert conceded that preexisting conditions could not be ruled out as the cause of G.Z.'s injuries.  (*Id.* at pp. 872, 878.)  On these facts, the Court of Appeal reversed the juvenile court's order sustaining the petition based on the presumption under section 355.1, concluding mother's evidence rebutted the presumption.  (*Id.* at p. 886.)

reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (See *In re H.B.* (2024) 106 Cal.App.5th 219, 237-238; *In re M.D.* (2023) 93 Cal.App.5th 836, 856.) "Actual harm to a child is not necessary before a child can be removed." (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) "On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809; accord, *In re I.R.* (2021) 61 Cal.App.5th 510, 520; see *Conservatorship of O.B., supra*, 9 Cal.5th at p. 1005 ["when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof"].)

Although the Department generally has the burden to produce evidence that removal is necessary, section 361, subdivision (c)(1), provides an exception: "The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent." Thus, the code "establishes a rebuttable presumption that removal is necessary in a narrow subset of cases—where a young child has been severely physically abused and the parent was either the perpetrator of the abuse or unreasonably failed to protect the child from the abuse. In those

29

cases, the fact the court adjudicated the child a dependent under section 300, subdivision (e) provides prima facie evidence that the child faces a substantial risk of physical harm in the parent's custody and there are no reasonable means to protect the child short of removal." (*In re E.E., supra,* 49 Cal.App.5th at p. 218; accord, *In re M.V.* (2022) 78 Cal.App.5th 944, 959.)

Here, as discussed, substantial evidence supports the juvenile court's findings under section 300, subdivision (e), that Arlette suffered severe physical abuse by one of the parents and the other parent knew or reasonably should have known of the abuse. These findings are prima facie evidence that Arlette's removal was warranted under section 361, subdivision (c)(1). At the disposition hearing Father did not offer any evidence to rebut this presumption, and he did not challenge the removal of the children, arguing only that the court should not bypass reunification services.[17]

In any event, removal of all three children was supported by substantial evidence they were not safe in the home of the parents.[18] Arlette's abuse by one or both of the parents was

---

[17] We decline to find that Father forfeited his challenge to the disposition order, as urged by the Department. However, we decline to consider the evidence Father has presented for the first time in his opening brief that prior to the jurisdiction hearing he and Mother maintained positive monitored visitation with the children and participated in parenting classes and counseling.

[18] Father does not argue that we should analyze Anais and Leeana's removal differently from Arlette's removal. However, insofar as we considered dependency jurisdiction over Anais and Leeana only under section 300, subdivision (j), we limit the section 361, subdivision (c)(1), rebuttable presumption to Arlette.

severe, occurred more than once, and resulted in lasting disabilities.  Prior to removal, Arlette, Leeana, Anais, and the parents all shared a single room where Arlette's abuse likely occurred.  Detective Chin observed that Mother had no support in the home and appeared to be depressed or suffering from posttraumatic stress disorder.  Mother was barely sleeping as she cared for three (and sometimes four) small children.  Further, at the time of the disposition hearing, Leeana and Arlette were only about 15 months old, and Anais was just over two years old.  The prior triggers for abuse, including the overwhelming nature of caring for three or four small children, remained.

Moreover, the parents were not diligent in addressing Arlette's health problems and injuries.  Leeana and Arlette received no primary medical care, and the parents repeatedly ignored hospital instructions for follow-up appointments after each of Arlette's visits to an emergency department.  Mother walked out of one emergency room visit before she could consult with a pediatrician, and the parents decided not to call 911 the second time Arlette stopped breathing.  There was also a risk that the parents' relationship presented a continuing danger to the children.  Shortly before the jurisdiction and disposition hearing, the social worker stated based on 10 months of working with the family that Father was very controlling of Mother, limiting Mother's visitation with the children and her communications with investigators.  Ramona saw signs of violence between the parents earlier in their relationship and Mother no longer confided in her.  The Department was concerned the parents were colluding in their denials of abuse, and despite clear and convincing evidence to the contrary, Father continued to deny the possibility Arlette could have been abused

31

by Mother or his family members.  Further, Father has not identified any other disposition that would protect the children without removing them from his care.  Under the circumstances, substantial evidence supported removal of the children from the parents, with monitored visitation and reunification services.

## DISPOSITION

The jurisdiction findings and disposition orders are affirmed.


FEUER, J.

We concur:



SEGAL, Acting P. J.



STONE, J.